H. L. *v.* MATHESON, GOVERNOR OF UTAH, ET AL.

No. 79–5903.   Argued October 6, 1980—Decided March 23, 1981

BURGER, C. J., delivered the opinion of the Court, in which STEWART, WHITE, POWELL, and REHNQUIST, JJ., joined. POWELL, J., filed a concurring opinion, in which STEWART, J., joined, *post*, p. 413. STEVENS, J., filed an opinion concurring in the judgment, *post*, p. 420. MARSHALL, J., filed a dissenting opinion, in which BRENNAN and BLACKMUN, JJ., joined, *post*, p. 425.

*David S. Dolowitz* argued the cause and filed a brief for appellant.

*Paul M. Tinker,* Assistant Attorney General of Utah, argued the cause for appellees. With him on the brief was *Robert B. Hansen,* Attorney General.*

CHIEF JUSTICE BURGER delivered the opinion of the Court.

The question presented in this case is whether a state statute which requires a physician to "[n]otify, if possible,"

---

*Briefs of *amici curiae* urging reversal were filed by *Abigail English* and *Pauline H. Tesler* for the Coalition for the Medical Rights of Women et al.; and by *Eve W. Paul* and *Harriet F. Pilpel* for the Planned Parenthood Federation of America, Inc., et al.

*Dennis J. Horan, Victor G. Rosenblum, John D. Gorby, Patrick A. Trueman,* and *Dolores V. Horan* filed a brief for Americans United for Life as *amicus curiae* urging affirmance.

*Lynn D. Wardle* and *Robert W. Barker* filed a brief for the Utah Association of Women et al. as *amici curiae.*

the parents of a dependent, unmarried minor girl prior to performing an abortion on the girl violates federal constitutional guarantees.

I

In the spring of 1978, appellant was an unmarried 15-year-old girl living with her parents in Utah and dependent on them for her support. She discovered she was pregnant. She consulted with a social worker and a physician. The physician advised appellant that an abortion would be in her best medical interest. However, because of Utah Code Ann. § 76–7–304 (1978), he refused to perform the abortion without first notifying appellant's parents.

Section 76–7–304, enacted in 1974, provides:

"To enable the physician to exercise his best medical judgment [in considering a possible abortion], he shall:

"(1) Consider all factors relevant to the well-being of the woman upon whom the abortion is to be performed including, but not limited to,

"(a) Her physical, emotional and psychological health and safety,

"(b) Her age,

"(c) Her familial situation.

"(2) *Notify, if possible, the parents or guardian of the woman upon whom the abortion is to be performed, if she is a minor* or the husband of the woman, if she is married." (Emphasis supplied.) [1]

---

[1] Whether parents of a minor are liable under Utah law for the expense of an abortion and related aftercare is not disclosed by the record.

Utah also provides by statute that no abortion may be performed unless a "voluntary and informed written consent" is first obtained by the attending physician from the patient. In order for such a consent to be "voluntary and informed," the patient must be advised at a minimum about available adoption services, about fetal development, and about foreseeable complications and risks of an abortion. See Utah Code Ann. § 76–7–305 (1978). In *Planned Parenthood of Central Mo.* v. *Danforth,*

Violation of this section is a misdemeanor punishable by imprisonment for not more than one year or a fine of not more than $1,000.[2]

Appellant believed "for [her] own reasons" that she should proceed with the abortion without notifying her parents. According to appellant, the social worker concurred in this decision.[3] While still in the first trimester of her pregnancy, appellant instituted this action in the Third Judicial District Court of Utah.[4] She sought a declaration that § 76-7-304 (2) is unconstitutional and an injunction prohibiting appellees, the Governor and the Attorney General of Utah, from enforcing the statute. Appellant sought to represent a class consisting of unmarried "minor women who are suffering unwanted pregnancies and desire to terminate the pregnancies but may not do so" because of their physicians' insistence on complying with § 76-7-304 (2). The trial judge declined to grant a temporary restraining order or a preliminary injunction.[5]

The trial judge held a hearing at which appellant was the only witness. Appellant affirmed the allegations of the complaint by giving monosyllabic answers to her attorney's

---

428 U. S. 52, 65-67 (1976), we rejected a constitutional attack on written consent provisions.

[2] Utah Code Ann. §§ 76-7-314 (3), 76-3-204 (1), 76-3-301 (3) (1978).

[3] Appellant's counsel stated in his jurisdictional statement and again in his brief that the physician concluded not only that an abortion would be in appellant's best interests, but also that parental notification would not be in appellant's best interests. However, at oral argument, counsel corrected this statement and conceded that there is no evidence to support this assertion. Tr. of Oral Arg. 8, 17.

[4] The record does not reveal whether appellant proceeded with the abortion.

[5] The trial judge allowed appellant to proceed without appointment of a guardian *ad litem*. He noted that a guardian would be required to notify the parents.

leading questions.[6]   However, when the State attempted to cross-examine appellant about her reasons for not wishing to notify her parents, appellant's counsel vigorously ob-

---

[6] The testimony was as follows:

"BY MR. DOLOWITZ [appellant's counsel]:

"Q At the time that the Complaint in this matter was signed, you were pregnant?

"A Yes.

"Q You had consulted with a counselor about that pregnancy?

"A Yeah.

"Q You had determined after talking to the counselor that you felt you should get an abortion?

"A Yes.

"Q You felt that you did not want to notify your parents—

"A Right.

"Q —of that decision?   You did not feel for your own reasons that you could discuss it with them?

"A Right.

"Q After discussing the matter with a counselor, you still believed that you should not discuss it with your parents?

"A Right.

"Q And they shouldn't be notified?

"A Right.

"Q After talking the matter over with a counselor, the counselor concurred in your decision that your parents should not be notified?

"A Right.

"Q You were advised that an abortion couldn't be performed without notifying them?

"A Yes.

"Q You then came to me to see about filing a suit?

"A Right.

"Q You and I discussed it as to whether or not you had a right to do what you wanted to do?

"A Yes.

"Q You decided that, after our discussion, you should still proceed with the action to try to obtain an abortion without notifying your parents?

"A Right.

"Q Now, at the time that you signed the Complaint and spoke with the counselor and spoke with me, you were in the first trimester of pregnancy, within your first twelve weeks of pregnancy?

jected,[7] insisting that "the specifics of the reasons are really irrelevant to the Constitutional issue."[8] The only constitutionally permissible prerequisites for performance of an abortion, he insisted, were the desire of the girl and the medi-

"A Yes.

"Q You feel that, from talking to the counselor and thinking the situation over and discussing it with me, that you could make the decision on your own that you wished to abort the pregnancy?

"A Yes.

"Q You are living at home?

"A Yes.

"Q You still felt, even though you were living at home with your parents, that you couldn't discuss the matter with them?

"A Right."

Tr. 5-7.

[7] "BY MR. McCARTHY [counsel for the State]:

"Q . . . Are you still living at home?

"A Yes.

"Q Are you dependent on your parents?

"A Yes.

"Q All your money comes from them?

"A Yes.

"Q How old are you now?

"A Fifteen.

"Q Aside from the issue of abortion, do you have any reason to feel that you can't talk to your parents about other problems?

"A Yes.

"Q What are those reasons?

"MR. DOLOWITZ: Now you are moving into the problem area that I indicated. . . ."

*Id.,* at 8.

[8] *Id.,* at 10. Appellant repeatedly pressed this point despite the trial court's statements that it could "conceive of a situation where a child probably wouldn't have to tell the parents" and that the statute "might be [u]nconstitutional as it relates to a particular fact situation but [c]onstitutional as it relates to another fact situation." *Id.,* at 10, 17.

There is no evidence to support the "surmise" in the dissent, *post,* at 438, n. 24, that "appellant expects family conflict over the abortion decision."

cal approval of a physician.[9] The trial judge sustained the objection, tentatively construing the statute to require appellant's physician to notify her parents "if he is able to physically contact them."

Thereafter, the trial judge entered findings of fact and conclusions of law. He concluded that appellant "is an appropriate representative to represent the class she purports to represent." [10] He construed the statute to require notice to appellant's parents "if it is physically possible." He concluded that § 76-7-304 (2) "do[es] not unconstitutionally restrict the right of privacy of a minor to obtain an abortion or to enter into a doctor-patient relationship." [11] Accordingly, he dismissed the complaint.

On appeal, the Supreme Court of Utah unanimously upheld the statute. 604 P. 2d 907 (1979). Relying on our decisions in *Planned Parenthood of Central Mo.* v. *Danforth,* 428 U. S. 52 (1976), *Carey* v. *Population Services International,* 431 U. S. 678 (1977), and *Bellotti* v. *Baird,* 443 U. S. 622 (1979) (*Bellotti II*), the court concluded that the statute serves "significant state interest[s]" that are present with respect to minors but absent in the case of adult women.

The court looked first to subsection (1) of § 76-7-304. This provision, the court observed, expressly incorporates the factors we identified in *Doe* v. *Bolton,* 410 U. S. 179 (1973), as pertinent to exercise of a physician's best medical judgment in making an abortion decision. In *Doe,* we stated:

"We agree with the District Court . . . that the medical judgment may be exercised in the light of *all factors— physical, emotional, psychological, familial, and the wom-*

[9] Tr. 18.

[10] The trial judge adopted, verbatim, findings of fact and conclusions of law prepared by appellant. The findings, the conclusions, and the opinion of the State Supreme Court make no mention whatsoever of the precise limits of the class.

[11] The trial judge also ruled that the statute does not violate 42 U. S. C. § 1983.

an's age—*relevant to the well-being of the patient.* All these factors may relate to health. This allows the attending physician the room he needs to make his best medical judgment." *Id.,* at 192 (emphasis supplied).

Section 76–7–304 (1) of the Utah statute suggests that the legislature sought to reflect the language of *Doe.*

The Utah Supreme Court held that notifying the parents of a minor seeking an abortion is "substantially and logically related" to the *Doe* factors set out in § 76–7–304 (1) because parents ordinarily possess information essential to a physician's exercise of his best medical judgment concerning the child. 604 P. 2d, at 909–910. The court also concluded that encouraging an unmarried pregnant minor to seek the advice of her parents in making the decision of whether to carry her child to term promotes a significant state interest in supporting the important role of parents in child-rearing. *Id.,* at 912. The court reasoned that since the statute allows no veto power over the minor's decision, it does not unduly intrude upon a minor's rights.

The Utah Supreme Court also rejected appellant's argument that the phrase "if possible" in § 76–7–304 (2) should be construed to give the physician discretion whether to notify appellant's parents. The court concluded that the physician is required to notify parents "if under the circumstances, in the exercise of reasonable diligence, he can ascertain their identity and location and it is feasible or practicable to give them notification." The court added, however, that "the time element is an important factor, for there must be sufficient expedition to provide an effective opportunity for an abortion." 604 P. 2d, at 913.

## II

Appellant challenges the statute as unconstitutional on its face. She contends it is overbroad in that it can be construed to apply to all unmarried minor girls, including those who are mature and emancipated. We need not reach that question

since she did not allege or proffer any evidence that either she or any member of her class is mature or emancipated.[12] The trial court found that appellant "is unmarried, fifteen years of age, resides at home and is a dependent of her parents." That affords an insufficient basis for a finding that she is either mature or emancipated. Under *Harris* v. *McRae,* 448 U. S. 297, 320 (1980), she therefore lacks "the personal stake in the controversy needed to confer standing" to advance the overbreadth argument.

There are particularly strong reasons for applying established rules of standing in this case. The United States District Court for Utah has held that § 76–7–304 (2) does not apply to emancipated minors and that, if so applied, it would be unconstitutional. *L. R.* v. *Hansen,* Civil No. C–80–0078J (Feb. 8, 1980). Since there was no appeal from that ruling, it is controlling on the State. We cannot assume that the statute, when challenged in a proper case, will not be construed also to exempt demonstrably mature minors.[13] See *Bellotti* v. *Baird,* 428 U. S. 132, 146–148 (1976) (*Bellotti I*). Nor is there any reason to assume that a minor in need of emergency treatment will be treated in any way different from

---

[12] In *Bellotti II,* by contrast, the principal class consisted of "unmarried [pregnant] minors in Massachusetts *who have adequate capacity to give a valid and informed consent* [to abortion], and who do not wish to involve their parents." 443 U. S., at 626 (emphasis supplied). The courts considered the rights of "all pregnant minors who might be affected" by the statute. *Id.,* at 627, n. 5.

[13] The record shows that the State unsuccessfully argued in the trial court that it should be permitted to inquire into appellant's degree of maturity. Tr. 11.

Justice Stevens and the dissent argue that the Utah Supreme Court held that the statute may validly be applied to all members of the class described in the complaint. *Post,* at 421, 430, 431, 432–433. However, as we have shown, neither of the state courts mentioned the scope or limits of the class. See n. 10, *supra.* Moreover, appellant's counsel prepared the findings and conclusions. In addition to considerations of standing, we construe the ambiguity against appellant.

a similarly situated adult.[14]  The Utah Supreme Court has had no occasion to consider the application of the statute to such situations.  In *Bellotti I, supra,* we unanimously declined to pass on constitutional challenges to an abortion regulation statute because the statute was "susceptible of a construction by the state judiciary 'which might avoid in whole or in part the necessity for federal constitutional adjudication, or at least materially change the nature of the problem.' "  *Id.,* at 147, quoting *Harrison* v. *NAACP,* 360 U. S. 167, 177 (1959).  See *Kleppe* v. *New Mexico,* 426 U. S. 529, 546–547 (1976); *Ashwander* v. *TVA,* 297 U. S. 288, 346–347 (1936) (concurring opinion).  We reaffirm that approach and find it controlling here insofar as appellant challenges a purported statutory exclusion of mature and emancipated minors.

The only issue before us, then, is the facial constitutionality of a statute requiring a physician to give notice to parents, "if possible," prior to performing an abortion on their minor daughter, (a) when the girl is living with and dependent upon her parents, (b) when she is not emancipated by marriage or otherwise, and (c) when she has made no claim or showing as to her maturity or as to her relations with her parents.

## III

### A

Appellant contends the statute violates the right to privacy recognized in our prior cases with respect to abortions.  She

---

[14] There is no authority for the view expressed in the dissent that the statute would apply to "minors with emergency health care needs." *Post,* at 450–451.  Appellant does not so contend, and the Utah Supreme Court in this case took pains to say that time is of the essence in an abortion decision.  604 P. 2d 907, 913 (1979).  When the specific question was properly posed in *Bellotti II,* the Massachusetts statute was construed by the state court not to apply in such cases.  443 U. S., at 630.

The same is true for minors with hostile home situations, a class referred to by appellant's *amici curiae* and by the dissent, *post,* at 437–441.

places primary reliance on *Bellotti II*, 443 U. S., at 642, 655. In *Danforth,* we struck down state statutes that imposed a requirement of prior written *consent* of the patient's spouse and of a minor patient's parents as a prerequisite for an abortion. We held that a state

> "does not have the constitutional authority to give a third party an absolute, and possibly arbitrary, veto over the decision of the physician and his patient to terminate the patient's pregnancy, regardless of the reason for withholding the consent." 428 U. S., at 74.

We emphasized, however, "that our holding . . . does not suggest that every minor, regardless of age or maturity, may give effective consent for termination of her pregnancy." *Id.,* at 75, citing *Bellotti I, supra.* There is no logical relationship between the capacity to become pregnant and the capacity for mature judgment concerning the wisdom of an abortion.

In *Bellotti II,* dealing with a class of concededly mature pregnant minors, we struck down a Massachusetts statute requiring parental or judicial consent before an abortion could be performed on any unmarried minor. There the State's highest court had construed the statute to allow a court to overrule the minor's decision even if the court found that the minor was capable of making, and in fact had made, an informed and reasonable decision to have an abortion. We held, among other things, that the statute was unconstitutional for failure to allow mature minors to decide to undergo abortions without parental consent. Four Justices concluded that the flaws in the statute were that, as construed by the state court, (a) it permitted overruling of a mature minor's decision to abort her pregnancy; and (b) "it requires parental consultation or notification in every instance, without affording the pregnant minor an opportunity to receive an independent judicial determination that she is mature enough to

consent or that an abortion would be in her best interests." 443 U. S., at 651. Four other Justices concluded that the defect was in making the abortion decision of a minor subject to veto by a third party, whether parent or judge, "no matter how mature and capable of informed decisionmaking" the minor might be. *Id.*, at 653–656.

Although we have held that a state may not constitutionally legislate a blanket, unreviewable power of parents to veto their daughter's abortion,[15] a statute setting out a "mere requirement of parental notice" does not violate the constitutional rights of an immature, dependent minor.[16] Four Justices in *Bellotti II* joined in stating:

"[Plaintiffs] suggest . . . that the mere requirement of parental notice [unduly burdens the right to seek an abortion]. As stated in Part II above, however, parental notice and consent are qualifications that typically may be imposed by the State on a minor's right to make important decisions. As immature minors often lack the ability to make fully informed choices that take account of both immediate and long-range consequences, a State reasonably may determine that parental consultation often is desirable and in the best interest of the minor. It may further determine, as a general proposition, that such consultation is particularly desirable with respect to the abortion decision—one that for some people raises profound moral and religious concerns. . . .

" 'There can be little doubt that the State furthers a constitutionally permissible end by encouraging an unmarried pregnant minor to seek the help and advice of

---

[15] *Bellotti II*, 443 U. S., at 642–643, 653–656; *Danforth*, 428 U. S., at 74.

[16] *Bellotti II*, *supra*, at 640, 649; *id.*, at 657 (dissenting opinion); *Danforth*, *supra*, at 90–91 (concurring opinion); see *Bellotti* v. *Baird*, 428 U. S. 132, 145, 147 (1976) (*Bellotti I*); cf. *Carey* v. *Population Services International*, 431 U. S. 678, 709–710 (1977).

her parents in making the very important decision whether or not to bear a child. That is a grave decision, and a girl of tender years, under emotional stress, may be ill-equipped to make it without mature advice and emotional support. It seems unlikely that she will obtain adequate counsel and support from the attending physician at an abortion clinic, where abortions for pregnant minors frequently take place.' " *Id.*, at 640–641 (footnotes omitted), quoting *Danforth,* 428 U. S., at 91 (concurring opinion).

Accord, 443 U. S., at 657 (dissenting opinion).

In addition, "constitutional interpretation has consistently recognized that the parents' claim to authority in their own household to direct the rearing of their children is basic in the structure of our society." *Ginsberg* v. *New York,* 390 U. S. 629, 639 (1968). In *Quilloin* v. *Walcott,* 434 U. S. 246 (1978), the Court expanded on this theme:

> "We have recognized on numerous occasions that the relationship between parent and child is constitutionally protected. See, *e. g., Wisconsin* v. *Yoder,* 406 U. S. 205, 231–233 (1972); *Stanley* v. *Illinois,* [405 U. S. 645 (1972)]; *Meyer* v. *Nebraska,* 262 U. S. 390, 399–401 (1923). 'It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.' " *Id.,* at 255, quoting *Prince* v. *Massachusetts,* 321 U. S. 158, 166 (1944).

See also *Parham* v. *J. R.,* 442 U. S. 584, 602 (1979); *Pierce* v. *Society of Sisters,* 268 U. S. 510, 535 (1925). We have recognized that parents have an important "guiding role" to play in the upbringing of their children, *Bellotti II, supra,* at 633–639, which presumptively includes counseling them on important decisions.

## B

The Utah statute gives neither parents nor judges a veto power over the minor's abortion decision.[17]  As in *Bellotti I*, "we are concerned with a statute directed toward minors, as to whom there are unquestionably greater risks of inability to give an informed consent." 428 U. S., at 147. As applied to immature and dependent minors, the statute plainly serves the important considerations of family integrity[18] and protecting adolescents[19] which we identified in *Bellotti II*. In addition, as applied to that class, the statute serves a significant state interest by providing an opportunity for parents to supply essential medical and other information to a physician. The medical, emotional, and psychological consequences of an abortion are serious and can be lasting; this is particularly so when the patient is immature.[20] An adequate medical and psychological case history is important to the physician. Parents can provide medical and psychological data, refer the physician to other sources of medical history, such as family physicians, and authorize family physicians to give relevant data.

---

[17] The main premise of the dissent seems to be that a requirement of notice to the parents is the functional equivalent of a requirement of parental consent. See *post*, at 437–441. In *Bellotti II*, however, we expressly declined to equate notice requirements with consent requirements. 443 U. S., at 640, 657.

[18] *Bellotti II, supra*, at 637–639. The short shrift given by the dissent to "parental authority and family integrity," *post*, at 447, runs contrary to a long line of constitutional cases in this Court. See cases cited *supra*, at 410.

[19] *Bellotti II, supra*, at 634–637.

[20] Abortion is associated with an increased risk of complication in subsequent pregnancies. Maine, Does Abortion Affect Later Pregnancies?, 11 Family Planning Perspectives 98 (1979). The emotional and psychological effects of the pregnancy and abortion experience are markedly more severe in girls under 18 than in adults. Wallerstein, Kurtz, & Bar-Din, Psychosocial Sequelae of Therapeutic Abortion in Young Unmarried Women, 27 Arch. Gen. Psychiatry 828 (1972); see also Babikian & Goldman, A Study in Teen-Age Pregnancy, 128 Am. J. Psychiatry 755 (1971).

Appellant intimates that the statute's failure to declare, in terms, a detailed description of what information parents may provide to physicians, or to provide for a mandatory period of delay after the physician notifies the parents,[21] renders the statute unconstitutional. The notion that the statute must itemize information to be supplied by parents finds no support in logic, experience, or our decisions. And as the Utah Supreme Court recognized, 604 P. 2d, at 913, time is likely to be of the essence in an abortion decision. The Utah statute is reasonably calculated to protect minors in appellant's class by enhancing the potential for parental consultation concerning a decision that has potentially traumatic and permanent consequences.[22]

Appellant also contends that the constitutionality of the statute is undermined because Utah allows a pregnant minor to consent to other medical procedures without formal notice to her parents if she carries the child to term.[23] But a state's interests in full-term pregnancies are sufficiently different to justify the line drawn by the statutes. Cf. *Maher* v. *Roe*, 432 U. S. 464, 473-474 (1977). If the pregnant girl elects to carry her child to term, the *medical* decisions to be made entail few—perhaps none—of the potentially grave

---

[21] At least five States have enacted parental notification statutes containing brief mandatory waiting periods. See La. Rev. Stat. Ann. § 40:-1299.35.5 (West Supp. 1981) (24 hours' actual notice or 72 hours' constructive notice except for court-authorized abortions); Mass. Gen. Laws Ann., ch. 112, § 12S (West Supp. 1981) (24 hours); Me. Rev. Stat. Ann., Tit. 22, § 1597 (1980) (24 hours); N. D. Cent. Code § 14–02.1–03 (Supp. 1979) (24 hours); Tenn. Code Ann. § 39–302 (Supp. 1979) (two days).

[22] Members of the particular class now before us in this case have no constitutional right to notify a court in lieu of notifying their parents. See *Bellotti II, supra,* at 647. This case does not require us to decide in what circumstances a state must provide alternatives to parental notification.

[23] See Utah Code Ann. § 78–14–5 (4) (f) (1977) (permitting any female to give informed consent "to any health care not prohibited by law . . . in connection with her pregnancy or childbirth").

emotional and psychological consequences of the decision to abort.

That the requirement of notice to parents may inhibit some minors from seeking abortions is not a valid basis to void the statute as applied to appellant and the class properly before us. The Constitution does not compel a state to fine-tune its statutes so as to encourage or facilitate abortions. To the contrary, state action "encouraging childbirth except in the most urgent circumstances" is "rationally related to the legitimate governmental objective of protecting potential life." *Harris* v. *McRae,* 448 U. S., at 325. Accord, *Maher* v. *Roe, supra,* at 473–474.[24]

As applied to the class properly before us, the statute plainly serves important state interests, is narrowly drawn to protect only those interests, and does not violate any guar-- antees of the Constitution.[25] The judgment of the Supreme Court of Utah is

*Affirmed.*

JUSTICE POWELL, with whom JUSTICE STEWART joins, concurring.

I

This case requires the Court to consider again the divisive questions raised by a state statute intended to encourage

---

[24] See also *Bellotti II,* 443 U. S., at 643–644; *Bellotti I,* 428 U. S., at 148–149; *Danforth,* 428 U. S., at 65–67, 79–81; *Connecticut* v. *Menillo,* 423 U. S. 9, 11 (1975); *West Side Women's Services, Inc.* v. *City of Cleveland,* 450 F. Supp. 796, 798 (ND Ohio), affirmance order, 582 F. 2d 1281 (CA6), cert. denied, 439 U. S. 983 (1978).

[25] Appellant argues that the statute violates her right to secure necessary treatment from a physician who, in the exercise of his best medical judgment, does not believe the parents should be notified. Since there is no evidence that the physician had such an opinion, we decline to reach this question. See *supra,* at 401, n. 3, and 405–407.

The dissenting opinion purports to see in the Court's opinion "a clear signal" as to how the Court will decide a future case concerning this or a similar statute, and goes on to forecast a successful challenge on the

parental involvement in the decision of a pregnant minor to have an abortion. See *Planned Parenthood of Central Mo.* v. *Danforth,* 428 U. S. 52 (1976); *Bellotti* v. *Baird,* 443 U. S. 622 (1979) (*Bellotti II*). I agree with the Court that Utah Code Ann. § 76–7–304 (2) (1978) does not unconstitutionally burden this appellant's right to an abortion. I join the opinion of the Court on the understanding that it leaves open the question whether § 76–7–304 (2) unconstitutionally burdens the right of a mature minor or a minor whose best interests would not be served by parental notification. See *ante,* at 412, n. 22. I write to make clear that I continue to entertain the views on this question stated in my opinion in *Bellotti II.* See n. 8, *infra.*

II

Section 76–7–304 (2) requires that a physician "[n]otify, if possible, the parents or guardian of the woman upon whom the abortion is to be performed, if she is a minor." [1] Appellant attacks this notice requirement on the ground that it burdens the right of a minor who is emancipated, or who is mature enough to make the abortion decision independently of parental involvement, or whose parents will react obstructively upon notice. See *ante,* at 405. The threshold question, as the Court's opinion notes, is whether appellant has standing to make such a challenge. Standing depends initially on what the complaint alleges, *Warth* v. *Seldin,* 422 U. S. 490, 498, 501 (1975), as courts have the power "only to redress or otherwise to protect against injury to the complaining party."

merits. Today, of course, the Court's function is to decide only the question properly presented in this case, and there is no occasion to intimate or predict a view as to the proper resolution of some future case. Speaking for the unanimous Court in *Kleppe* v. *New Mexico,* 426 U. S. 529 (1976), JUSTICE MARSHALL took note of the impropriety of deciding constitutional questions "in the absence of 'an adequate and full-bodied record.'" *Id.,* at 546, quoting *Public Affairs Associates, Inc.* v. *Rickover,* 369 U. S. 111, 113 (1962).

[1] Section 76–7–304 is quoted in full in the Court's opinion. *Ante,* at 400.

*Id.,* at 499. The complaint in this case was carefully drawn. Appellant's allegations about herself and her familial situation are few and laconic. She alleged that she did "not wish to inform her parents of her condition and believe[d] that it [was] in her best interest that her parents not be informed of her condition." Complaint ¶ 6. She also alleged that she understood "what is involved in her decision," ¶ 9, and that the physician she consulted had told her that "he could not and would not perform an abortion upon her without informing her parents prior to aborting her." ¶ 7.

Appellant was 15 years of age and lived at home with her parents when she filed her complaint. She did not claim to be mature, and made no allegations with respect to her relationship with her parents. She did not aver that they would be obstructive if notified, or advance any other reason why notice to her parents would not be in her best interest. Similarly, the complaint contains no allegation that the physician—while apparently willing to perform the abortion—believed that notifying her parents would have adverse consequences. In fact, nothing in the record shows that the physician had any information about appellant's parents or familial situation, or even that he had examined appellant.

## A

This case does not come to us on the allegations of the complaint alone. An evidentiary hearing occurred after the trial court had denied appellant's motion for a preliminary injunction. Appellant was the only witness, and her testimony—and statements by her counsel—make clear beyond any question that the "bare bones" averments of the complaint were deliberate, and that appellant is arguing that a mere notice requirement is invalid *per se* without regard to the minor's age, whether she is emancipated, whether her parents are likely to be obstructive, or whether there is some health or other reason why notification would not be in the minor's best interests.

On direct examination, appellant merely verified the allegations of her complaint by affirming each allegation as paraphrased for her by her lawyer in a series of leading questions.[2] Her testimony on cross-examination added nothing to the complaint.[3] In addition, appellant's lawyer insistently objected to all questions by counsel for the State as to the appellant's reasons for not wishing to notify her parents.[4] The trial court, on its own initiative, pressed unsuccessfully to elicit some reasons, inquiring how it could "find out the validity of [appellant's] reasons without [the State's lawyer] being permitted to cross-examine her." Tr. 9. Appellant's lawyer replied:

> "It is our position [c]onstitutionally that she has the right to make [the abortion] decision and if she has consulted with a counselor and the counselor concurs that those are valid reasons, why then—
>
> .     .     .     .     .
>
> "In terms of going beyond [the complaint allegations], our point is that the specifics of *the reasons are really irrelevant to the [c]onstitutional issue.*" *Id.,* at 9–10 (emphasis supplied).

---

[2] Appellant's testimony on direct examination is quoted in full in the Court's opinion. *Ante,* at 402–403, n. 6.

[3] Appellant's testimony on cross-examination is quoted in full in the Court's opinion. *Ante,* at 403, n. 7.

[4] After his direct examination of appellant and the State's brief cross-examination, appellant's lawyer insisted repeatedly during subsequent argument that "there is no relevancy to any other facts," Tr. 17; that "the particular facts that come before a [minor's doctor], are irrelevant," *id.,* at 18; and that "[t]he specific facts of any individual case, no matter how ridiculous they are or how strong or weak they are, really become irrelevant," *ibid.* In summarizing his position, appellant's lawyer stated: "Our position is that it is the doctor/patient relationship that is the key. If the doctor determines he should go ahead with the patient, then he should. The specific facts in any case, whether [the doctor] is wrong or right, are [c]onstitutionally protected to make that decision and go ahead and act on it. This is why I say it is irrelevant." *Ibid.*

When appellant's lawyer insisted that the facts with respect to this particular minor were irrelevant, the trial court sustained the validity of the statute.[5]

In sum, and as the Court's opinion emphasizes, appellant alleges nothing more than that she desires an abortion, that she has decided—for reasons which she declined to reveal— that it is in her best interest not to notify her parents, and that a physician would be willing to perform the abortion if notice were not required. Although the trial court did not rule in terms of standing, it is clear that these bald allegations do not confer standing to claim that § 76–7–304 (2) unconstitutionally burdens the right either of a mature minor or of a minor whose best interests would not be served by parental notification.[6] They confer standing only to claim that § 76–7–304 (2) is an unconstitutional burden upon an unemanci-

---

[5] At the end of the evidentiary hearing, appellant's lawyer framed the trial court's ruling as follows:

"If your ruling is that 'if possible' [as used in the statute means "physically possible"] and there are no circumstances whatever that justify the violation of the statute, then the issue is closed." *Id.*, at 19.

[6] Because this case is a class action, it might be presumed that other members could raise the question whether a pregnant minor has a right to abortion, without parental notice, upon a showing that she is mature or that her parents will interfere with her abortion. But the record in this case contains no facts to support a presumption that the class includes such members. The only complaint allegations about the class are that appellant's claims "are typical of the claims of all members of the class," and that the class consists of "minor women who are suffering unwanted pregnancies and desire to terminate the pregnancies but may not do so inasmuch as their physicians will not perform an abortion upon them without compliance with the provisions of Section 76–7–304 (2)." Complaint ¶ 10. Thus, the record supports only the conclusion that the class consists entirely of pregnant minors who assert the identical claim that appellant presents: a constitutional right to an abortion without notifying their parents, and without claiming to be mature or that notification would not be in their best interest. In short, the class members—like appellant—assert an absolute right to make this decision themselves, independently of everyone except a physician.

pated minor who desires an abortion without parental notification but also desires not to explain to anyone her reasons either for wanting the abortion or for not wanting to notify her parents.[7]

## B

On the facts of this case, I agree with the Court that § 76–7–304 (2) is not an unconstitutional burden on appellant's right to an abortion. Numerous and significant interests compete when a minor decides whether or not to abort her

---

[7] The trial court entered findings of fact and conclusions of law after the evidentiary hearing. Paragraph 7 of the trial court's findings reads:

"The plaintiff consulted with a counselor to assist her in deciding whether or not she should terminate her pregnancy. She determined, after consultation with her counselor, that she should secure an abortion, but was advised when consulting her physician that under the provisions of Section 76–7–304 (2), Utah Code Annotated, 1953, that he believed along with her that she should be aborted and that he felt it was in her best medical interest to do so but he could not and would not perform an abortion upon her without informing her parents prior to aborting her because it was required of him by that statute and he was unwilling to perform an abortion upon her without complying with the provisions of the statute even though he believed it was best to do so." Civil No. C–78–2719 (Dec. 26, 1978).

Precisely what this paragraph finds is ambiguous. At the least, it finds that appellant "consulted" a physician and that the physician agreed with appellant that an abortion would be in appellant's best medical interest. The final portion of the finding—"he was unwilling to perform an abortion upon her without complying with the provisions of the statute even though he believed it was best to do so"—could be read to find that the physician also agreed with appellant that "it was best" to "perform an abortion upon her without complying with the provisio[n]" requiring parental notice. Or, the final portion could be read to find only that the physician would not perform an abortion without complying with the statute even though he believed that "it was best" to abort appellant's pregnancy. In light of appellant's limited allegations and testimony, and the legal argument of her lawyer, the trial court's finding cannot be read as saying that the physician determined that appellant's parents would react hostilely or obstructively to notice of appellant's abortion decision.

pregnancy. The right to make that decision may not be unconstitutionally burdened. *Roe* v. *Wade*, 410 U. S. 113, 154 (1973); *Planned Parenthood of Central Mo.* v. *Danforth*, 428 U. S., at 74–75. In addition, the minor has an interest in effectuating her decision to abort, if that is the decision she makes. *Id.*, at 75; *Bellotti II*, 443 U. S., at 647. The State, aside from the interest it has in encouraging childbirth rather than abortion, cf. *Maher* v. *Roe*, 432 U. S. 464 (1977); *Harris* v. *McRae*, 448 U. S. 297 (1980), has an interest in fostering such consultation as will assist the minor in making her decision as wisely as possible. *Planned Parenthood of Central Mo.* v. *Danforth, supra,* at 91 (STEWART, J., concurring); *post,* at 422–423 (STEVENS, J., concurring in judgment). The State also may have an interest in the family itself, the institution through which "we inculcate and pass down many of our most cherished values, moral and cultural." *Moore* v. *East Cleveland,* 431 U. S. 494, 503–504 (1977). Parents have a traditional and substantial interest in, as well as a responsibility for, the rearing and welfare of their children, especially during immature years. *Bellotti II, supra,* at 637–639.

None of these interests is absolute. Even an adult woman's right to an abortion is not unqualified. *Roe* v. *Wade, supra,* at 154. Particularly when a minor becomes pregnant and considers an abortion, the relevant circumstances may vary widely depending upon her age, maturity, mental and physical condition, the stability of her home if she is not emancipated, her relationship with her parents, and the like. If we were to accept appellant's claim that § 76–7–304 (2) is *per se* an invalid burden on the asserted right of a minor to make the abortion decision, the circumstances which normally are relevant would—as her counsel insisted—be immaterial. *Supra,* at 417. The Court would have to decide that the minor's wishes are virtually absolute. To be sure, our cases have emphasized the necessity to consult a physician. But we have never held with respect to a minor that the opin-

ion of a single physician as to the need or desirability of an abortion outweighs all state and parental interests.[8]

In sum, a State may not validly require notice to parents in all cases, without providing an independent decisionmaker to whom a pregnant minor can have recourse if she believes that she is mature enough to make the abortion decision independently or that notification otherwise would not be in her best interests. My opinion in *Bellotti II,* joined by three other Justices, stated at some length the reasons why such a decisionmaker is needed. *Bellotti II, supra,* at 642–648.[9] The circumstances relevant to the abortion decision by a minor can and do vary so substantially that absolute rules— requiring parental notice in all cases or in none[10]—would create an inflexibility that often would allow for no consideration of the rights and interests identified above. Our cases have never gone to this extreme, and in my view should not.

JUSTICE STEVENS, concurring in the judgment.

As the Court points out, this is a class action in which the appellant represents all unmarried " 'minor women who are suffering unwanted pregnancies and desire to terminate the pregnancies but may not do so' because of their physicians' insistence on complying with § 76–7–304 (2)" of the Utah

---

[8] While the medical judgment of a physician of course is to be respected, there is no reason to believe as a general proposition that even the most conscientious physician's interest in the overall welfare of a minor can be equated with that of most parents. Moreover, abortion clinics, now readily available in most urban communities, may be operated on a commercial basis where abortions often may be obtained "on demand." See *Planned Parenthood of Central Mo.* v. *Danforth,* 428 U. S. 52, 91–92, n. 2 (1976) (STEWART, J., concurring); *Bellotti II,* 443 U. S., at 641, n. 21.

[9] Although *Bellotti II* involved a statute requiring parental consent, the rationale of the plurality opinion with respect to this need is applicable here.

[10] The dissenting opinion of JUSTICE MARSHALL, which would hold the Utah statute invalid on its face, elevates the decision of the minor and her physician to an absolute status ignoring state and parental interests.

Code. *Ante,* at 401. The Utah Supreme Court held that the statute may validly be applied to *all* members of that class. This appeal therefore squarely presents the question whether that holding is consistent with the Constitution of the United States. The Court, however, declines to reach this question and instead decides the narrower question presented by the appellant's particular factual situation. Because I believe we have a duty to answer the broader question decided by the Utah Supreme Court, I am unable to join the opinion of the Court.

In *Planned Parenthood of Central Mo.* v. *Danforth,* 428 U. S. 52, 72–75 (1976), the Court held that a pregnant minor's right to make the decision to obtain an abortion may not be conditioned on parental consent. My dissent from that holding, *id.,* at 102–105, does not qualify my duty to respect it as a part of our law. See *Bellotti* v. *Baird,* 443 U. S. 622, 652–656 (1979) (STEVENS, J., concurring in judgment). However, as I noted in *Bellotti,* neither that case nor *Danforth* "determines the constitutionality of a statute which does no more than require notice to the parents, without affording them or any other third party an absolute veto." 443 U. S., at 654, n. 1. Since the outcome in this case is not controlled by *Danforth,* the principles that I considered dispositive of the parental consent issue in that case plainly dictate that the Utah statute now before us be upheld.

The fact that a state statute may have some impact upon a minor's exercise of his or her rights begins, rather than ends, the constitutional inquiry. Once the statute's impact is identified, it must be evaluated in light of the state interests underlying the statute. The state interest that the Utah statute at issue in this case attempts to advance is essentially the same state interest considered in *Danforth.* As I noted in *Danforth,* that interest is fundamental and substantial:

"The State's interest in the welfare of its young citizens justifies a variety of protective measures. Because he

may not foresee the consequences of his decision, a minor may not make an enforceable bargain. He may not lawfully work or travel where he pleases, or even attend exhibitions of constitutionally protected adult motion pictures. Persons below a certain age may not marry without parental consent. Indeed, such consent is essential even when the young woman is already pregnant. The State's interest in protecting a young person from harm justifies the imposition of restraints on his or her freedom even though comparable restraints on adults would be constitutionally impermissible. Therefore, the holding in *Roe* v. *Wade* [410 U. S. 113 (1973)] that the abortion decision is entitled to constitutional protection merely emphasizes the importance of the decision; it does not lead to the conclusion that the state legislature has no power to enact legislation for the purpose of protecting a young pregnant woman from the consequences of an incorrect decision.

"The abortion decision is, of course, more important than the decision to attend or to avoid an adult motion picture, or the decision to work long hours in a factory. It is not necessarily any more important than the decision to run away from home or the decision to marry. But even if it is the most important kind of a decision a young person may ever make, that assumption merely enhances the quality of the State's interest in maximizing the probability that the decision be made correctly and with full understanding of the consequences of either alternative." 428 U. S., at 102–103.

In my opinion, the special importance of a young woman's abortion decision, emphasized by JUSTICE MARSHALL in dissent, *post*, at 435–436, provides a special justification for reasonable state efforts intended to ensure that the decision be wisely made. Such reasonable efforts surely may include a requirement that an abortion be procured only after consul-

tation with a licensed physician. And, because "the most significant consequences of the [abortion] decision are not medical in character," 428 U. S., at 103, the State unquestionably has an interest in ensuring that a young woman receive other appropriate consultation as well. In my opinion, the quality of that interest is plainly sufficient to support a state legislature's determination that such appropriate consultation should include parental advice.

Of course, a conclusion that the Utah statute is invalid would not prevent young pregnant women from voluntarily seeking the advice of their parents prior to making the abortion decision. But the State may legitimately decide that such consultation should be made more probable by ensuring that parents are informed of their daughter's decision:

"If there is no parental-[notice] requirement, many minors will submit to the abortion procedure without ever informing their parents. An assumption that the parental reaction will be hostile, disparaging, or violent no doubt persuades many children simply to bypass parental counsel which would in fact be loving, supportive, and, indeed, for some indispensable. It is unrealistic, in my judgment, to assume that every parent-child relationship is either (a) so perfect that communication and accord will take place routinely or (b) so imperfect that the absence of communication reflects the child's correct prediction that the parent will . . . [act] arbitrarily to further a selfish interest rather than the child's interest. A state legislature may conclude that most parents will be primarily interested in the welfare of their children,[1] and further, that the imposition

---

[1] My conclusion, in this case and in *Danforth*, that a state legislature may rationally decide that most parents will, when informed of their daughter's pregnancy, act with her welfare in mind is consistent with the "pages of human experience that teach that parents generally do act in the child's best interests" relied upon by the Court in *Parham* v. *J. R.*,

of a parental-[notice] requirement is an appropriate method of giving the parents an opportunity to foster that welfare by helping a pregnant distressed child to make and to implement a correct decision." *Id.*, at 103–104 (STEVENS, J.).

Utah's interest in its parental-notice statute is not diminished by the fact that there can be no guarantee that meaningful parent-child consultation will actually occur. Good-faith compliance with the statute's requirements would tend to facilitate communication between daughters and parents regarding the abortion decision. The possibility that some parents will not react with compassion and understanding upon being informed of their daughter's predicament or that, even if they are receptive, they will incorrectly advise her, does not undercut the legitimacy of the State's attempt to establish a procedure that will enhance the probability that a pregnant young woman exercise as wisely as possible her right to make the abortion decision.

The fact that certain members of the class of unmarried "minor women who are suffering unwanted pregnancies and desire to terminate the pregnancies" may actually be emancipated or sufficiently mature to make a well-reasoned abor-

---

442 U. S. 584, 602–603 (1979). It is also consistent with JUSTICE BRENNAN's opinion in *Parham*, which I joined. *Id.*, at 625–639.

As the Court noted in *Parham*, the presumption that parents act in the best interests of their children may be rebutted by "experience and reality." *Id.*, at 602–603. In my opinion, nothing in the fact that a minor child has become pregnant, and therefore may be confronted with the abortion decision, undercuts the general validity of the presumption. However, when parents decide to surrender custody of their child to a mental hospital and thereby destroy the ongoing family relationship, that very decision raises an inference that parental authority is not being exercised in the child's best interests. See *id.*, at 631–632 (BRENNAN, J., dissenting in part). Accordingly, while the abortion decision and the commitment decision are of comparable gravity, reliance upon the "pages of human experience" is, in my judgment, more appropriate in the former case than in the latter.

tion decision does not, in my view, undercut the validity of the Utah statute. As I stated in *Danforth,* a state legislature has constitutional power to utilize, for purposes of implementing a parental-notice requirement, a yardstick based upon the chronological age of unmarried pregnant women. That this yardstick will be imprecise or even unjust in particular cases does not render its use by a state legislature impermissible under the Federal Constitution. 428 U. S., at 104–105. Accordingly, I would reach the question reserved by the Court and hold that the Utah parental-notice statute is constitutionally valid as applied to all members of the certified class.[2]

Because my view in this case, as in *Danforth,* is that the State's interest in protecting a young pregnant woman from the consequences of an incorrect abortion decision is sufficient to justify the parental-notice requirement, I agree that the decision of the Utah Supreme Court should be affirmed.

JUSTICE MARSHALL, with whom JUSTICE BRENNAN and JUSTICE BLACKMUN join, dissenting.

The decision of the Court is narrow. It finds shortcomings in appellant's complaint and therefore denies relief. Thus, the Court sends out a clear signal that more carefully drafted pleadings could secure both a plaintiff's standing to

---

[2] The Court's unwillingness to decide whether the Utah statute may constitutionally be applied to the entire class certified by the state courts presumably rests on the assumption that requiring notice to the parents of a mature or emancipated minor might prevent such a minor from obtaining an abortion. See *ante,* at 406. Almost by definition, however, a woman intellectually and emotionally capable of making important decisions without parental assistance also should be capable of ignoring any parental disapproval. Furthermore, if every minor with the wisdom of an adult has a constitutional right to be treated as an adult, a uniform minimum voting age is surely suspect. Instead of simply enforcing general rules promulgated by the legislature, perhaps the judiciary should grant hearings to all young persons desirous of establishing their status as mature, emancipated minors instead of confining that privilege to unmarried pregnant young women.

challenge the overbreadth of Utah Code Ann. § 76-7-304 (2) (1978), and success on the merits.[1]

Nonetheless, I dissent. I believe that even if the complaint is defective, the majority's legal analysis is incorrect and it yields an improper disposition here. More important, I cannot agree with the majority's view of the complaint, or its standing analysis. I therefore would reverse the judgment of the Supreme Court of Utah.

I

The Court finds appellant's complaint defective because it fails to allege that she is mature or emancipated, and neglects to specify her reasons for wishing to avoid notifying her parents about her abortion decision. As a result, the Court rea-

---

[1] Under the majority's view, to assure standing, the plaintiff pregnant minor simply need allege her desire to obtain an abortion, her inability to do so because of the statute, and her view that she is emancipated, mature, or that it is in her best interests to have an abortion performed without notifying her parents. The majority finds no standing problem where the complaint alleges that the plaintiff is emancipated or mature, and thus reaffirms the standing analysis employed in *Bellotti* v. *Baird*, 443 U. S. 622 (1979) (*Bellotti II*). See *ante*, at 406, n. 12. In addition, the Court relies in part on a decision by the Federal District Court in Utah, which enjoined application of the same Utah statute involved here to emancipated minors. *L. R.* v. *Hansen*, Civil No. C-80-0078J (Feb. 8, 1980). The Court apparently contemplates that similar challenges will meet with success in the future. For example, the District Court in *L. R.* v. *Hansen* also accorded intervenor status and awarded preliminary relief to a minor woman who, like appellant, is under 17 years old and is dependent upon a parent with whom she resides. The only difference between the allegations of the instant appellant and those of that intervenor is the latter's express allegation that parental notice would result in her expulsion from home and destruction of her relationship with her parent. *L. R.* v. *Hansen*, Civil No. C-80-0078J (Findings of Fact and Conclusions of Law ¶ 4) (Oct. 24, 1980). Finally, the Court today does not question our prior decision upholding the standing of physicians to challenge abortion restrictions. See n. 4, *infra*.

sons, appellant lacks standing to challenge the overbreadth of the Utah parental notification statute.[2]

The majority's standing analysis rests on prudential con-

---

[2] In essence, the Court concludes that because appellant neglected to make specific allegations about herself and her situation, she "lacks 'the personal stake in the controversy needed to confer standing' to advance the overbreadth argument," *ante,* at 406 (quoting *Harris* v. *McRae,* 448 U. S. 297, 320 (1980)). The majority thus assumes that a plaintiff raising an overbreadth challenge to an abortion statute must allege that she herself falls within the statute's overbroad reach. The quotation from *Harris* actually refers to an entirely different kind of standing issue: there the plaintiffs lacked standing because they failed to allege that they were in a position either to seek abortions or to receive Medicaid, and thus they lacked the concrete adverseness necessary to advance their challenge to the Medicaid limit on abortion funding. None of the cases cited for this point in *Harris* apply to the instant appeal. See *O'Shea* v. *Littleton,* 414 U. S. 488 (1974) (plaintiffs lack standing because of failure to allege specific injury); *Bailey* v. *Patterson,* 369 U. S. 31, 32 (1962) (petitioners "lack standing to enjoin criminal prosecutions under Mississippi's breach-of-peace statutes, since they do not allege that they have been prosecuted or threatened with prosecution under them").

A standing limitation on overbreadth challenges to an abortion statute has roots in a context hardly analogous to the instant case. For while we have frequently ruled that criminal defendants lack standing to challenge a statute's overbreadth when their conduct indisputedly falls within the statute's legitimate core, *e. g., United States* v. *National Dairy Products Corp.,* 372 U. S. 29 (1963); *United States* v. *Harriss,* 347 U. S. 612 (1954); *Williams* v. *United States,* 341 U. S. 97 (1951), these rulings bear little relationship to appellant's challenge to a State's restriction of her exercise of a fundamental right. See *Planned Parenthood of Central Mo.* v. *Danforth,* 428 U. S. 52 (1976); *Doe* v. *Bolton,* 410 U. S. 179 (1973). More relevant, I believe, is our analysis of standing to claim that a statute's overbreadth affects fundamental liberties, primarily those guaranteed by the First Amendment. Because of the risk that exercise of personal freedoms may be chilled by broad regulation, we permit facial overbreadth challenges without a showing that the moving party's conduct falls within the protected core. *Gooding* v. *Wilson,* 405 U. S. 518 (1972); *Coates* v. *Cincinnati,* 402 U. S. 611 (1971); *United States* v. *Robel,* 389 U. S. 258 (1967); *Shuttlesworth* v. *City of Birmingham,* 394 U. S. 147 (1969); *Cox* v. *Louisiana,* 379 U. S. 536 (1965); *Aptheker* v. *Secretary of*

cerns and not on the constitutional limitations set by Art. III. See *Gladstone, Realtors* v. *Village of Bellwood,* 441 U. S. 91, 99–100 (1979); *Warth* v. *Seldin,* 422 U. S. 490, 498–499, 517–518 (1975). For the Court does not question that appellant's injury due to the statute's requirement falls within the legally protected ambit of her privacy interest, and that the relief requested would remedy the harm. See *ante,* at 407–409 (majority opinion); *ante,* at 418–419 (opinion of POWELL, J.). The Court decides only that appellant cannot challenge the blanket nature of the statute because she neglected to allege that by her personal characteristics, she is a member of particular groups that undoubtedly deserve exemption from a parental notice requirement.[3] Thus, the Court seems to apply the familiar prudential principle that an individual should not be heard to raise the rights of other persons. This principle, of course, has not precluded standing in other instances where, as here, the party has established the requisite and legally protected interest capable of

---

*State,* 378 U. S. 500 (1964); *Kunz* v. *New York,* 340 U. S. 290 (1951). See also *United States* v. *Reese,* 92 U. S. 214 (1876) (facial challenge under Fifteenth Amendment).

[3] See n. 1, *supra.* The Court does not question that exceptions from a parental notice requirement are necessary for minors emancipated from the custody or control of their parents, see n. 48, *infra,* and for minors able to demonstrate their maturity for the purpose of choosing to have an abortion, *ante,* at 406–407. See also *Bellotti II,* 443 U. S., at 651 (POWELL, J.); *id.,* at 653 (STEVENS, J.). Nor does the Court depart from the view, made explicit in JUSTICE POWELL's opinion in *Bellotti II, supra,* at 651, that a State cannot require parental notice when it would not be in the minor's best interests to do so. This position is articulated anew today by JUSTICE POWELL, *ante,* at 420, and bolstered by the majority, which acknowledges the need for exception where parental notification interferes with emergency medical treatment, *ante,* at 407, n. 14, and which leaves open the possibility of relief where the minor makes a "claim or showing as to . . . her relations with her parents," *ante,* at 407, or demonstrates a "hostile home situatio[n]," *ante,* at 407, n. 14. See also *L. R.* v. *Hansen,* Civil No. C–80–0078J (Utah, Feb. 8, 1980, and Oct. 24, 1980).

redress through the relief requested.[4]   See, *e. g., Duke Power Co.* v. *Carolina Environmental Study Group,* 438 U. S. 59, 80–81 (1978); *Singleton* v. *Wulff,* 428 U. S. 106, 113–118 (1976) (plurality opinion of BLACKMUN, J.); *Doe* v. *Bolton,* 410 U. S. 179, 188–189 (1973); *Griswold* v. *Connecticut,* 381 U. S. 479, 481 (1965); *NAACP* v. *Alabama ex rel. Patterson,* 357 U. S. 449, 459–460 (1958); *Barrows* v. *Jackson,* 346 U. S. 249, 259 (1953).

I do not believe that prudential considerations should bar standing here, for I am persuaded that appellant's complaint establishes a claim that notifying her parents would not be in her best interests.[5]   She alleged that she "believes that it is in her best interest that her parents not be informed of her [pregnant] condition," Complaint ¶ 6, App. 4, and that after consulting with her physician, attorney, and social worker, "she understands what is involved in her decision" to seek an abortion, Complaint ¶ 9, App. 4.[6]   This claim was further

---

[4] It is especially noteworthy that we have not refrained from according to physicians, threatened with the personal risk of prosecution, standing to challenge abortion restrictions by asserting the rights of any of their patients. *E. g., Planned Parenthood of Central Mo.* v. *Danforth, supra,* at 62; *Doe* v. *Bolton, supra; Griswold* v. *Connecticut,* 381 U. S. 479 (1965).

[5] In the instant case, application of the prudential rule causes undue commingling of jurisdictional and merits issues. For here, the third-party interests do not even come into play until appellant wishes to rebut the State's interests, which themselves are asserted only after appellant has established a burden on her protected interests. First, the appellant must satisfy a court that, on the merits, her fundamental right to privacy in consulting her physician about an abortion is burdened by the Utah statute. Only then need the State assert its countervailing state interests, which here include promoting family autonomy and parental authority. And only in rebuttal would appellant next challenge as overbroad the means employed by the State, for the absolute ban regulates the abortion decision of emancipated and mature minors, and others whose best interests call for an abortion without parental notice. Thus, in the name of prudence, the majority's standing analysis depends upon its evaluation of the complicated merits.

[6] Appellant's consultation with three professionals casts substantial

supported, albeit without detail, at the evidentiary hearing. There appellant testified she did not feel she could discuss the abortion decision with her parents even after she consulted a social worker on the issue. Tr. 8, App. 26.[7] In my judgment, appellant has adequately asserted that she has persistently held reasons for believing parental notice would not be in her best interests. This provides a sufficient basis for standing to raise the challenge in her complaint. Appellant seeks to challenge a state statute, construed definitively by the highest court of that State to permit no exception to the notice requirement on the basis of any reasons offered by the minor. 604 P. 2d 907, 913 (Utah 1979). As standing is a jurisdictional issue, separate and distinct from the merits, a court need not evaluate the persuasiveness of her reasons for opposing parental notice to conclude that appellant has a concrete interest in determining whether the parental notice statute is valid.[8]

---

doubt on JUSTICE POWELL's suggestion, see *ante,* at 418, that appellant "desires not to explain to anyone her reasons either for wanting the abortion or for not wanting to notify her parents."

[7] This portion of the transcript is set out in full *ante,* at 402–403, n. 6, 403, n. 7.

JUSTICE POWELL correctly reports, *ante,* at 416–417, that the in-chambers hearing elicited from appellant statements essentially identical to her complaint. And it is also true that counsel for appellant objected to inquiries by the appellees and the trial judge regarding appellant's exact reasons for not wanting to talk with her parents about her pregnancy or other matters. What JUSTICE POWELL neglects to note, however, is that counsel's objections stemmed from the trial court's own ruling that any facts specific to appellant's situation would be irrelevant to the physician's duty under the statute to notify her parents of an abortion decision. Because the trial judge ruled that the statute and its sanctions would apply regardless of the pregnant minor's personal reasons for opposing parental notification, the judge sustained the objections to questions about appellant's particular reasons. Tr. 14–20, App. 31–36. It is this ruling that is the legal basis for the decision below, and not the trial judge's preliminary comments cited by the majority, *ante,* at 403, n. 8.

[8] I also doubt the wisdom in pinning a minor's success in challenging a

Yet even if the Court's view of appellant's complaint is correct, and even if prudence calls for denying her standing to raise the overbreadth claim, the Court erroneously concludes that the class represented by appellant suffers the identical standing disability. In so doing, the Court is apparently indifferent to the federalism or comity issues arising when this Court presumes to supervise the procedural determinations made by a state trial court under state law. Even if application of federal law governing class actions were appropriate in this case, the majority misapplies federal law by disturbing the class definition as approved by the trial court. The Court acknowledges, *ante,* at 401, 404 (BURGER, C. J.); *ante,* at 417, n. 6 (POWELL, J.), that the trial court granted appellant's motion to represent a class, and it is undisputed that this class includes all "minor women who are suffering unwanted pregnancies and desire to terminate the pregnancies but may not do so inasmuch as their physicians will not perform an abortion upon them without compliance with the provisions of Section 76–7–304 (2)." Complaint ¶ 10, App. 5. This class by definition includes *all* minor women, self-supporting or dependent, sophisticated or naive, as long as the Utah statute interferes with the ability of these women to decide with their physicians to obtain abortions. If the Court is correct that appellant cannot raise challenges based on the interest of emancipated or mature minors, or others whose best interests call for avoiding parental notification, the proper disposition under federal law would be a remand. This remand would protect such class members by permitting the trial court to determine whether appellant is a proper and adequate class representative, and whether her claims are sufficiently similar to the class to warrant the class ac-

blanket parental notice requirement to consideration of her particular situation by judges, as opposed to others who are more regularly involved in the counseling of adolescents. Cf. *Bellotti II,* 443 U. S., at 655–656 (STEVENS, J.).

tion.[9]  Since the trial court enjoys considerable latitude in approving class actions, such a remand is appropriate only on those rare occasions where the reviewing court discerns an abuse of discretion.[10]  But where an abuse of discretion is clear from the record, remand should ensue, and could result in redefinition or dismissal of the class, addition of other named plaintiffs to represent interests appellant cannot advance, or creation of subclasses with additional representative parties.[11]  In contrast, it is improper to assume appel-

[9] As the Court observed in *Eisen* v. *Carlisle & Jacquelin*, 417 U. S. 156, 176 (1974), the federal class action procedure "was intended to insure that the judgment, whether favorable or not, would bind all class members who did not request exclusion from the suit." The binding effect of the class action's disposition poses serious due process concerns where the interests of class members are not properly represented. 7A C. Wright & A. Miller, Federal Practice and Procedure § 1765 (1972).

Where review of the claims asserted is impaired by an obvious lack of homogenity in the class approved by the trial court, the reviewing court must remand "for reconsideration of the class definition," *Kremens* v. *Bartley*, 431 U. S. 119, 134–135 (1977), and for a determination whether the named plaintiff is a proper representative of the class, *Martin* v. *Thompson Tractor Co.*, 486 F. 2d 510, 511 (CA5 1973).

[10] *E. g., Bogus* v. *American Speech & Hearing Assn.*, 582 F. 2d 277 (CA3 1978); *Dellums* v. *Powell*, 184 U. S. App. D. C. 275, 566 F. 2d 167 (1977), cert. denied, 438 U. S. 916 (1978); *Barnett* v. *W. T. Grant Co.*, 518 F. 2d 543 (CA4 1975); *Arkansas Ed. Assn.* v. *Board of Ed. of Portland, Arkansas School Dist.*, 446 F. 2d 763 (CA8 1971); *Gold Strike Stamp Co.* v. *Christensen*, 436 F. 2d 791 (CA10 1970).

It is difficult to conclude that the trial judge below in fact abused his discretion in approving the class. Other courts have approved similar classes represented by similar named plaintiffs, *e. g., Gary-Northwest Indiana Women's Services* v. *Bowen*, 421 F. Supp. 734 (ND Ind. 1976) (unmarried pregnant 16-year-old proper representative for class of unmarried pregnant minors under 18 challenging abortion restriction), summarily aff'd, 429 U. S. 1067 (1977). Conflict within the class, moreover, seems unlikely, for "it is difficult to imagine why any person in the class appellant represents would have an interest in seeing [the challenged statute] upheld." *Sosna* v. *Iowa*, 419 U. S. 393, 403, n. 13 (1975).

[11] A class may need to be redefined, *e. g., Gesicki* v. *Oswald*, 336 F.

lant adequately represents the entire class as defined by the trial court, but redefine the class appellant is deemed to represent, and deny relief on that basis.[12] Nonetheless, that is exactly the course selected by the majority today.

I instead assume that appellant adequately represents the class which the trial judge concluded she represents—all minor women seeking an abortion but finding the parental notice requirement an obstacle. I then would find that their rights and interests can be raised here by appellant in support of a facial challenge to the Utah statute, and conduct the appropriate review of appellant's claims.

---

Supp. 371, 374 (SDNY 1971) (three-judge court), divided into subclasses, *e. g.*, *Francis* v. *Davidson*, 340 F. Supp. 351 (Md. 1972) (three-judge court), or otherwise modified, to adequately protect its members' interests. See generally 7 Wright & Miller, *supra*, §§ 1758–1771 (1972 and Supp. 1980).

The majority mistakenly assumes, *ante*, at 406, n. 13, that it is free to rewrite the class as approved by the trial court because that court based its class definition on submissions from the plaintiff. This assumption runs counter to the general practice in both state and federal courts whereby the party seeking class certification proposes a class definition which is then subject to challenge by the opposing party. See 1 H. Newberg, Class Actions 644 (1977); 5 *id.*, at 1376, 1403. Appellees challenged the class without success, and the State Supreme Court never questioned the trial court's approval of appellant's class.

[12] See *ante*, at 420–421 (opinion of Stevens, J.). Justice Powell reasons, *ante*, at 417, n. 6, that the class members cannot raise the overbreadth claims because the record fails to disclose that they wish to raise such claims. In my view, the record is quite to the contrary. The class members, through their class representative, unequivocally raised in the complaint the overbreadth challenge to the Utah statute. Complaint ¶ 17, App. 6. This claim, along with the other allegations in the complaint, provided the context in which the trial judge approved appellant as class representative. In so approving, the trial court was obliged to ensure that appellant's allegations would adequately protect the interests of the class members, who would be bound by the judgment. If a reviewing court subsequently alters the claims that can be asserted by the named plaintiff, protection of the class interests requires a remand for reconsideration of the adequacy of the named plaintiff as class representative.

434

## II

Because the Court's treatment is so cursory, I review appellant's claims with due attention to our precedents.

Our cases have established that a pregnant woman has a fundamental right to choose whether to obtain an abortion or carry the pregnancy to term. *Roe* v. *Wade,* 410 U. S. 113 (1973); *Doe* v. *Bolton,* 410 U. S. 179 (1973).[13] Her choice, like the deeply intimate decisions to marry,[14] to procreate,[15] and to use contraceptives,[16] is guarded from unwarranted state intervention by the right to privacy.[17] Grounded in the Due Process Clause of the Fourteenth Amendment, the right to privacy [18] protects both the woman's "interest in independence in making certain kinds of important decisions"

---

[13] See also *Carey* v. *Population Services International,* 431 U. S. 678, 684–685 (1977); *Griswold* v. *Connecticut,* 381 U. S., at 482–485.

[14] *Zablocki* v. *Redhail,* 434 U. S. 374, 384–386 (1978); *Loving* v. *Virginia,* 388 U. S. 1, 12 (1967).

[15] *Skinner* v. *Oklahoma ex rel. Williamson,* 316 U. S. 535 (1942). See also *Cleveland Board of Education* v. *La Fleur,* 414 U. S. 632 (1974).

[16] *Eisenstadt* v. *Baird,* 405 U. S. 438, 453 (1972); *Griswold* v. *Connecticut, supra; Carey* v. *Population Services International, supra; Poe* v. *Ullman,* 367 U. S. 497, 539 (1961) (Harlan, J., dissenting) (ban on contraception is "intolerable and unjustifiable invasion of privacy in the conduct of the most intimate concerns of an individual's personal life").

[17] See also *Union Pacific R. Co.* v. *Botsford,* 141 U. S. 250, 251 (1891) ("No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law").

[18] The right has often been termed "the right to be let alone." See *Olmstead* v. *United States,* 277 U. S. 438, 478 (1928) (Brandeis, J., dissenting) (quoted with approval in *Stanley* v. *Georgia,* 394 U. S. 557, 564 (1969), and *Eisenstadt* v. *Baird, supra,* at 453–454, n. 10). Defining the spheres within which the government may not act without sufficient justification, the notion of privacy "emanates from the totality of the constitutional scheme under which we live." *Poe* v. *Ullman, supra,* at 521 (Douglas, J., dissenting).

and her "individual interest in avoiding disclosure of personal matters." *Whalen* v. *Roe,* 429 U. S. 589, 599–600 (1977).

In the abortion context, we have held that the right to privacy shields the woman from undue state intrusion in, and external scrutiny of, her very personal choice. Thus, in *Roe* v. *Wade, supra,* at 164, we held that during the first trimester of the pregnancy, the State's interest in protecting maternal health or the potential life of the fetus could not override the right of the pregnant woman and the attending physician to make the abortion decision through private, unfettered consultation. We further emphasized the restricted scope of permissible state action in this area when, in *Doe* v. *Bolton, supra,* at 198–200, we struck down state-imposed procedural requirements that subjected the woman's private decision with her physician to review by other physicians and a hospital committee.

It is also settled that the right to privacy, like many constitutional rights,[19] extends to minors. *Planned Parenthood*

---

[19] "Constitutional rights do not mature and come into being magically only when one attains the state-defined age of majority. Minors, as well as adults, are protected by the Constitution and possess constitutional rights. See, *e. g., Breed* v. *Jones,* 421 U. S. 519 (1975); *Goss* v. *Lopez,* 419 U. S. 565 (1975); *Tinker* v. *Des Moines School Dist.,* 393 U. S. 503 (1969); *In re Gault,* 387 U. S. 1 (1967). The Court indeed, however, long has recognized that the State has somewhat broader authority to regulate the activities of children than of adults. *Prince* v. *Massachusetts,* 321 U. S., at 170; *Ginsberg* v. *New York,* 390 U. S. 629 (1968)." *Planned Parenthood of Central Mo.* v. *Danforth,* 428 U. S., at 74–75.

See also *Brown* v. *Board of Education,* 347 U. S. 483 (1954) (children entitled to equal protection in schools).

The privacy right does not necessarily guarantee that "every minor, regardless of age or maturity, may give effective consent for termination of her pregnancy." *Planned Parenthood of Central Mo.* v. *Danforth, supra,* at 75. Utah, however, assigns this consent authority to a woman of any age who seeks pregnancy-related medical care, Utah Code Ann. § 78–14–5 (4) (f) (1977), subject to the State's informed consent requirements, see Utah Code Ann. § 76–7–305 (1978); § 78–14–5 (1977). This

*of Central Mo.* v. *Danforth,* 428 U. S. 52 (1976); *Bellotti* v. *Baird,* 443 U. S. 622, 639 (1979) *(Bellotti II)* (POWELL, J.); *id.,* at 653 (STEVENS, J.); *T. H.* v. *Jones,* 425 F. Supp. 873, 881 (Utah 1975), summarily aff'd on other grounds, 425 U. S. 986 (1976). Indeed, because an unwanted pregnancy is probably more of a crisis for a minor than for an adult, as the abortion decision cannot be postponed until her majority, "there are few situations in which denying a minor the right to make an important decision will have consequences so grave and indelible." *Bellotti II, supra,* at 646 (POWELL, J.).[20] Thus, for both the adult and the minor woman, state-imposed burdens on the abortion decision can be justified only upon a showing that the restrictions advance "important state interests." *Roe* v. *Wade,* 410 U. S., at 154; accord, *Planned Parenthood of Central Mo.* v. *Danforth, supra,* at 61. Before examining the state interests asserted here, it is necessary first to consider Utah's claim that its statute does not "imping[e] on a woman's decision to have an abortion" or "plac[e] obstacles in the path of effectuating such a decision." Brief for Appellees 9. This requires an examination of whether the parental notice requirement of the Utah statute imposes any burden on the abortion decision.

The ideal of a supportive family so pervades our culture that it may seem incongruous to examine "burdens" imposed by a statute requiring parental notice of a minor daughter's

---

appeal does not present the broad issue of when may a State require parental consent for a surgical procedure on a minor child, 604 P. 2d 907, 910, n. 5 (Utah 1979). At issue here is only the scope of the minor's constitutional privacy right in the face of a statutory parental notice requirement.

[20] In striking down a related Utah prohibition against family planning assistance for minors absent parental consent, a Federal District Court reasoned that the "financial, psychological and social problems arising from teenage pregnancy and motherhood argue for our recognition of the right of minors to privacy as being equal to that of adults." *T. H.* v. *Jones,* 425 F. Supp. 873, 881 (Utah 1975), summarily aff'd on other grounds, 425 U. S. 986 (1976).

decision to terminate her pregnancy.[21] This Court has long deferred to the bonds which join family members for mutual sustenance. See *Pierce* v. *Society of Sisters,* 268 U. S. 510, 534–535 (1925); *May* v. *Anderson,* 345 U. S. 528, 533 (1953); *Griswold* v. *Connecticut,* 381 U. S., at 486; *Stanley* v. *Illinois,* 405 U. S. 645, 651 (1972); *Moore* v. *East Cleveland,* 431 U. S. 494, 504–505 (1977) (plurality opinion of POWELL, J.). Especially in times of adversity, the relationships within a family can offer the security of constant caring and aid. See *id.,* at 505. Ideally, a minor facing an important decision will naturally seek advice and support from her parents, and they in turn will respond with comfort and wisdom.[22] If the pregnant minor herself confides in her family, she plainly relinquishes her right to avoid telling or involving them. For a minor in that circumstance, the statutory requirement of parental notice hardly imposes a burden.

Realistically, however, many families do not conform to this ideal. Many minors, like appellant, oppose parental notice and seek instead to preserve the fundamental, personal right to privacy. It is for these minors that the parental notification requirement creates a problem. In this context, involving the minor's parents against her wishes [23] effectively cancels her right to avoid disclosure of her personal choice. See *Whalen* v. *Roe,* 429 U. S., at 599–600. Moreover, the absolute notice requirement publicizes her private consulta-

[21] Appellees also argue that "[i]t is difficult to contemplate a relationship where the right of privacy as formulated in the abortion context could be less relevant than in the confines of the nuclear family." Brief for Appellees 22. This view, however, was expressly rejected in *Planned Parenthood of Central Mo.* v. *Danforth,* supra, at 75.

[22] Realization of this ideal, however, must depend on the quality of emotional attachments within the family, and not on legal patterns imposed by the State. See *Quilloin* v. *Walcott,* 434 U. S. 246, 255 (1978); *Moore* v. *East Cleveland,* 431 U. S., at 506.

[23] Nothing prevents the physician from encouraging the minor to consult her parents; only the minor who strenuously objects will remain burdened by the notice requirement.

tion with her doctor and interjects additional parties in the very conference held confidential in *Roe* v. *Wade, supra,* at 164. Besides revealing a confidential decision, the parental notice requirement may limit "access to the means of effectuating that decision." *Carey* v. *Population Services International,* 431 U. S. 678, 688 (1977). Many minor women will encounter interference from their parents after the state-imposed notification.[24] In addition to parental disappoint-

[24] The record here contains little about appellant's situation because the trial judge excluded any such evidence as irrelevant to the facial challenge to the mandatory notice requirement. In light of her claim that the notice requirement inhibits the exercise of her right to choose an abortion, however, we may surmise that appellant expects family conflict over the abortion decision. Indeed, the transcript of the evidentiary hearing, quoted *ante,* at 402–403, n. 6, 403, n. 7 (opinion of BURGER, C. J.), demonstrates that consultation with her social worker, her physician, and her lawyer did not alter appellant's steadfast belief that she could not discuss the issue with her parents.

The records in other cases are also instructive as to the interference posed by some parents to the exercise of some minor's privacy right. See *L. R.* v. *Hansen,* Civil No. C–80–0078J (Utah, Oct. 24, 1980) (preliminary relief awarded to minor alleging parent expelled from home minor sister who disclosed facts of pregnancy and abortion); see *Women's Community Health Center, Inc.* v. *Cohen,* 477 F. Supp. 542, 548 (Me. 1979) (expert affidavits that some parents "will pressure the minor, causing great emotional distress and otherwise disrupting the family relationship"); *Baird* v. *Bellotti,* 450 F. Supp. 997, 1001 (Mass. 1978) (uncontested evidence some parents "would insist on an undesired marriage, or on continuance of the pregnancy as punishment" or even physically harm the minor); *Wynn* v. *Carey,* 582 F. 2d 1375, 1388, n. 24 (CA7 1978) (suggesting same problems); *In re Diane,* 318 A. 2d 629, 630 (Del. Ch. 1974) (father opposes minor's abortion on religious grounds); *State* v. *Koome,* 84 Wash. 2d 901, 908, 530 P. 2d 260, 265 (1975) (parent thinks forcing daughter to bear child will deter her future pregnancies). See *Margaret S.* v. *Edwards,* 488 F. Supp. 181 (ED La. 1980). Parents also may oppose a minor's decision not to abort. *E. g., In re Smith,* 16 Md. App. 209, 295 A. 2d 238 (1972). See generally F. Furstenberg, Unplanned Parenthood: The Social Consequences of Teenage Childbearing 54 (1976); Jolly, Young, Female, and Outside the Law, in Teenage Women in the Juvenile Justice System: Changing Values 97, 102 (1979) ("When a young girl becomes pregnant, many families refuse to allow her back into their home"); Osofsky &

ment and disapproval, the minor may confront physical or emotional abuse, withdrawal of financial support, or actual obstruction of the abortion decision.   Furthermore, the threat of parental notice may cause some minor women to delay past the first trimester of pregnancy, after which the health risks increase significantly.[25]   Other pregnant minors may attempt to self-abort or to obtain an illegal abortion rather than risk parental notification.[26]   Still others may foresake

---

Osofsky, Teenage Pregnancy: Psychosocial Considerations, 21 Clin. Obstet. Gynecol. 1161, 1164–1165 (1978).   See also J. Bedger, Teenage Pregnancy 123–124 (1980) (large majority of sampled pregnant minors predict parental opposition to their abortions).

[25] *Women's Community Health Center, Inc.* v. *Cohen, supra,* at 548 (affidavits showing parental notice "may cause an adolescent to delay seeking assistance with her pregnancy, increasing the hazardousness of an abortion should she choose one"); Cates, Adolescent Abortions in the United States, 1 J. Adolescent Health Care 18, 24 (1980); Bracken & Kasl, Delay in Seeking Induced Abortion: A Review and Theoretical Analysis, 121 Am. J. Obstet. Gynecol. 1008, 1013 (1975); Hofmann, Consent and Confidentiality and Their Legal and Ethical Implications for Adolescent Medicine, in Medical Care of the Adolescent 42, 51 (J. Gallagher, F. Heald & D. Garell eds., 3d ed. 1976).

If she decides to abort after the first trimester of pregnancy, the minor faces more serious health risks.   *Roe* v. *Wade,* 410 U. S. 113, 163 (1973); Benditt, Second-Trimester Abortion in the United States, 11 Family Planning Perspectives 358 (1979); Cates, Schulz, Crimes, & Tyler, The Effect of Delay and Method Choice on the Risk of Abortion Morbidity, 9 Family Planning Perspectives 266 (1977).   If she decides to bear the child, her health risks are also greater than if she had a first trimester abortion. Cates, 1 J. Adolescent Health Care, *supra,* at 24; Cates & Tietze, Standardized Mortality Rates Associated with Legal Abortion: United States 1972–1975, 10 Family Planning Perspectives 109 (1978) (abortion within first 16 weeks of pregnancy safer than carrying pregnancy to term); "The Earlier the Safer" Applies to all Abortions, 10 Family Planning Perspectives 243 (1978).   See also Zackler, Andelman, & Bauer, The Young Adolescent as an Obstetric Risk, 103 Am. J. Obstet. Gynecol. 305 (1969) (complications associated with childbirth by minors).

[26] *Women's Community Health Center, Inc.* v. *Cohen, supra,* at 548 (affidavits that minor may turn to illegal abortion rather than have parents notified).   See also Kahan, Baker, & Freeman, The Effect of

an abortion and bear an unwanted child, which, given the minor's "probable education, employment skills, financial resources and emotional maturity, . . . may be exceptionally burdensome." *Bellotti II,* 443 U. S., at 642 (POWELL, J.). The possibility that such problems may not occur in particular cases does not alter the hardship created by the notice requirement on its face.[27] And that hardship is not a mere disincentive created by the State,[28] but is instead an actual

---

Legalized Abortion on Morbidity Resulting from Criminal Abortion, 121 Am. J. Obstet. Gynecol. 114 (1975) (illegal abortion rate drops when legal abortion available). The minor may also seek to abort herself, *Alice* v. *Department of Social Welfare,* 55 Cal. App. 3d 1039, 1044, 128 Cal. Rptr. 374, 377 (1976); A. Holder, Legal Issues in Pediatrics and Adolescent Medicine 285 (1977); or even commit suicide, see Teicher, A Solution to the Chronic Problem of Living: Adolescent Attempted Suicide, in Current Issues in Adolescent Psychiatry 129, 136 (J. Schoolar ed. 1973) (study showing that approximately one-fourth of female minors who attempt suicide do so because they are or believe they are pregnant).

[27] It is the presence of the notice requirement, and not merely its implementation in a particular case, that signifies the intrusion. Cf. *Planned Parenthood of Central Mo.* v. *Danforth,* 428 U. S. 52 (1976) (availability of veto, not exercise of veto, found unconstitutional).

Despite the Court's objection today that we have in the past "expressly declined to equate notice requirements with consent requirements," *ante,* at 411, n. 17, in *Bellotti II* the Court rejected a statute authorizing judicial review of a minor's abortion decision—as an alternative to parental consent—precisely because a parent notified of the court action might interfere. Thus, JUSTICE POWELL wrote for four Members of the Court: "[A]s the District Court recognized, 'there are parents who would obstruct, and perhaps altogether prevent, the minor's right to go to court.' . . . There is no reason to believe that this would be so in the majority of cases where consent is withheld. But many parents hold strong views on the subject of abortion, and young pregnant minors, especially those living at home, are particularly vulnerable to their parents' efforts to obstruct both an abortion and their access to court." 443 U. S., at 647.

[28] Thus, the notice requirement produces not only predictable disincentives to choose to abort, *Harris* v. *McRae,* 448 U. S., at 338 (MARSHALL, J., dissenting); *id.,* at 330 (BRENNAN, J., dissenting); but also " 'direct state interference with a protected activity,' " *id.,* at 315 (quoting with approval *Maher* v. *Roe,* 432 U. S. 464, 475 (1977)).

state-imposed obstacle to the exercise of the minor woman's free choice.[29]   For the class of pregnant minors represented by appellant, this obstacle is so onerous as to bar the desired abortions.[30]   Significantly, the interference sanctioned by the statute does not operate in a neutral fashion.   No notice is required for other pregnancy-related medical care,[31] so only the minor women who wish to abort encounter the burden imposed by the notification statute.   Because the Utah requirement of mandatory parental notice unquestionably burdens the minor's privacy right, the proper analysis turns next to the State's proffered justifications for the infringements posed by the statute.

## III

As established by this Court in *Planned Parenthood of Central Mo.* v. *Danforth,* the statute cannot survive appellant's challenge unless it is justified by a "significant state interest." [32]   Further, the State must demonstrate that the means

---

[29] See *Doe* v. *Bolton,* 410 U. S. 179 (1973) (invalidating procedural restrictions on availability of abortions); *Carey* v. *Population Services International,* 431 U. S., at 687–689 (partial restrictions on access to contraceptives subject to constitutional challenge).   Regardless of the personal views each of us may hold, the privacy right by definition secures latitude of choice for the pregnant minor without state approval of one decision over another.   Thus, JUSTICE STEVENS improperly inverts the reasoning of our decisions when he reiterates his previous view that the importance of the abortion decision points to a " 'State's interest in maximizing the probability that the decision be *made correctly* and with full understanding of the consequences of either alternative,' " *ante,* at 422 (emphasis added).

[30] See text accompanying n. 8 and see nn. 20, 24, 25, *supra.*

[31] Utah permits pregnant minors to consent to any medical procedure in connection with pregnancy and childbirth, but requires parental notice only before an abortion.   Compare Utah Code Ann. § 78–14–5 (4) (f) (1977) with § 76–7–304 (2) (1978).

[32] 428 U. S., at 75.   Cf. *Zablocki* v. *Redhail,* 434 U. S., at 388; *NAACP* v. *Button,* 371 U. S. 415, 438 (1963).   In *Roe* v. *Wade,* this Court concluded that the woman's privacy right may be tempered by "important [state] interests," 410 U. S., at 154, but the Court ultimately applied the

it selected are closely tailored to serve that interest.[33]   Where regulations burden the rights of pregnant adults, we have held that the State legitimately may be concerned with "protection of health, medical standards, and prenatal life." *Roe* v. *Wade,* 410 U. S., at 155. We concluded, however, that during the first trimester of pregnancy none of these interests sufficiently justifies state interference with the decision reached by the pregnant woman and her physician. *Id.,* at 162–163. Nonetheless, appellees assert here that the parental notice requirement advances additional state interests not implicated by a pregnant adult's decision to abort. Specifically, appellees contend that the notice requirement improves the physician's medical judgment about a pregnant minor in two ways: it permits the parents to provide additional information to the physician, and it encourages consultation between the parents and the minor woman. Appellees also advance an independent state interest in preserving parental rights and family autonomy. I consider each of these asserted interests in turn.[34]

## A

In upholding the statute, the Utah Supreme Court concluded that the notification provision might encourage parental transmission of "additional information, which might

---

"compelling state interest" test commonly used in reviewing state burdens on fundamental rights. *Id.,* at 155. Although it may seem that the minor's privacy right is somehow less fundamental because it may be overcome by a "significant state interest," the more sensible view is that state interests inapplicable to adults may justify burdening the minor's right. *Planned Parenthood of Central Mo.* v. *Danforth, supra,* at 74–75.

[33] *E. g., Roe* v. *Wade, supra,* at 155; *Griswold* v. *Connecticut,* 381 U. S., at 485.

[34] Appellees also argue that the notice requirement furthers legitimate state interests in enforcing Utah's criminal laws against statutory rape, fornication, adultery, and incest. Brief for Appellees 28–30. These interests were not asserted below, and are too tenuous to be considered seriously here.

prove invaluable to the physician in exercising his 'best medical judgment.' " [35] Yet neither the Utah courts nor the statute itself specifies the kind of information contemplated for this purpose, nor why it is available to the parents but not to the minor woman herself. Most parents lack the medical expertise necessary to supplement the physician's medical judgment, and at best could provide facts about the patient's medical history. It seems doubtful that a minor mature enough to become pregnant and to seek medical advice on her own initiative would be unable or unwilling to provide her physician with information crucial to the abortion decision. In addition, by law the physician already is obligated to obtain all information necessary to form his best medical judgment,[36] and nothing bars consultation with the parents should the physician find it necessary.

---

[35] 604 P. 2d, at 909–910.

[36] Section 76–7–304 (1) requires the physician to

"Consider all factors relevant to the well-being of the woman upon whom the abortion is to be performed including, but not limited to,

"(a) Her physical, emotional and psychological health and safety,

"(b) Her age,

"(c) Her familial situation."

Violations of this requirement are punishable by a year's imprisonment and $1,000 fine. Utah Code Ann. §§ 76–3–204 (1), 76–3–301 (3), 76–7–314 (3) (1978). Criminal sanctions also apply if the physician neglects to obtain the minor's informed written consent, and such consent can be secured only after the physician has notified the patient:

"(a) Of the names and addresses of two licensed adoption agencies in the state of Utah and the services that can be performed by those agencies, and nonagency adoption may be legally arranged; and

"(b) Of the details of development of unborn children and abortion procedures, including any foreseeable complications, risks, and the nature of the post-operative recuperation period; and

"(c) Of any other factors he deems relevant to a voluntary and informed consent." Utah Code Ann. § 76–7–305 (2) (1978).

The risk of malpractice suits also ensures that the physician will acquire whatever information he finds necessary before performing the abortion. See Utah Code Ann. § 78–14–5 (1977).

Moreover, "[i]f a physician is licensed by the State, he is recognized by

Even if mandatory parental notice serves a substantial state purpose in this regard, the Utah statute fails to implement it. Simply put, the statute on its face does not require or even encourage the transfer of information; it does not even call for a conversation between the physician and the parents. A letter from the physician to the parents would satisfy the statute, as would a brief telephone call made moments before the abortion.[37] Moreover, the statute is patently underinclusive if its aim is the transfer of information known to the parents but unavailable from the minor woman herself. The statute specifically excludes married minors from the parental notice requirement; only her husband need be told of the planned abortion, Utah Code Ann. § 76–7–304 (2) (1978), and Utah makes no claim that he possesses any information valuable to the physician's judgment but unavailable from the pregnant woman. Furthermore, no notice is required for other pregnancy-related care sought by the minor. See Utah Code Ann. § 78–14–5 (4)(f) (1977) (authorizing woman of any age to consent to pregnancy-related medical care). The minor woman may consent to surgical removal and analysis of amniotic fluid, caesarian delivery, and other medical care related to pregnancy. The physician's decisions concerning such procedures would be enhanced by parental information as much as would the abortion decision, yet only the abortion decision triggers the parental notice requirement. This result is especially anomalous given the comparatively lesser health risks associated with abortion as contrasted with other pregnancy-related medical care.[38] Thus, the statute not only fails to promote

the State as capable of exercising acceptable clinical judgment. If he fails in this, professional censure and deprivation of his license are available remedies." *Doe* v. *Bolton*, 410 U. S., at 199.

[37] The parties conceded as much at oral argument. Tr. of Oral Arg. 18–19, 29, 48.

[38] I am baffled by the majority's statement today that "[i]f the pregnant girl elects to carry her child to term, the *medical* decisions to be made

the transfer of information as is claimed, it does not apply to other closely related contexts in which such exchange of information would be no less important. The goal of promoting consultation between the physician and the parents of the pregnant minor cannot sustain a statute that is so ill-fitted to serve it.[39]

## B

Appellees also claim the statute serves the legitimate purpose of improving the minor's decision by encouraging consultation between the minor woman and her parents. Appellees do not dispute that the State cannot legally or

entail few—perhaps none—of the potentially grave and emotional and psychological consequences of the decision to abort," *ante*, at 412–413. Choosing to participate in diagnostic tests involves risks to both mother and child, and also may burden the pregnant woman with knowledge that the child will be handicapped. See 3 National Institutes of Health, Prevention of Embryonic, Fetal, and Perinatal Disease 347–352 (R. Brent & M. Harris eds. 1976); Risks in the Practice of Modern Obstetrics 59–81, 369–370 (S. Aladjem ed. 1975). The decision to undergo surgery to save the child's life certainly carries as serious "emotional and psychological consequences" for the pregnant adolescent as does the decision to abort; in both instances, the minor confronts the task of calculating not only medical risks, but also all the issues involved in giving birth to a child. See *id.*, at 59–81. For an unwed adolescent, these issues include her future educational and job opportunities, as well as the more immediate problems of finding financial and emotional support for offspring dependent entirely on her. *Michael M.* v. *Sonoma County Superior Court, post,* at 470, and nn. 3 and 4 (REHNQUIST, J.) (plurality opinion). When surgery to save the child's life poses greater risks to the mother's life, the emotional and ethical dimensions of the medical care decision assume crisis proportion. Of course, for minors, the mere fact of pregnancy and the experience of childbirth can produce psychological upheaval.

[39] More flexible regulations which defer to the physician's judgment but provide for parental notice in emergencies have been proposed. *E. g.,* IJA–ABA Standards for Juvenile Justice, Rights of Minors 4.2, 4.6, 4.8 (1980) (minor can consent to pregnancy-related medical care; physician should seek to obtain minor's permission to notify parent, and notify parent over minor's objection only if failure to inform "could seriously jeopardize the health of the minor").

practically require such consultation.[40]   Nor do appellees
contest the fact that the decision is ultimately the minor's to
make.[41]   Nonetheless, the State seeks through the notice re-
quirement to give parents the opportunity to contribute to
the minor woman's abortion decision.

Ideally, facilitation of supportive conversation would assist
the pregnant minor during an undoubtedly difficult experi-
ence.   Again, however, when measured against the rationality
of the means employed, the Utah statute simply fails to ad-
vance this asserted goal.   The statute imposes no requirement
that the notice be sufficiently timely to permit any dis-
cussion between the pregnant minor and the parents.   More-
over, appellant's claims require us to examine the statute's
purpose in relation to the parents who the minor believes are
likely to respond with hostility or opposition.   In this light,
the statute is plainly overbroad.   Parental consultation
hardly seems a legitimate state purpose where the minor's
pregnancy resulted from incest, where a hostile or abusive
parental response is assured, or where the minor's fears of
such a response deter her from the abortion she desires.
The absolute nature of the statutory requirement, with excep-
tion permitted only if the parents are physically unavailable,
violates the requirement that regulations in this funda-
mentally personal area be carefully tailored to serve a sig-
nificant state interest.[42]   "The need to preserve the consti-

[40] 604 P. 2d, at 912 ("the State has a special interest in encouraging
(but does not require) an unmarried pregnant minor to seek the advice of
her parents in making the important decision as to whether or not to
bear a child").

[41] *Ibid.* (notification statute "does not per se impose any restriction on
the minor as to her decision to terminate her pregnancy").   Cf. Utah
Code Ann. § 78–14–5 (4) (f) (1977) (woman of any age can consent to
any medical care related to pregnancy).   See generally *Planned Parent-
hood of Central Mo.* v. *Danforth,* 428 U. S., at 74 (State may not delegate
absolute veto authority to parents of pregnant minor seeking abortion).

[42] State-sponsored counseling services, in contrast, could promote family
dialogue and also improve the minor's decisionmaking process.   Appellant

tutional right and the unique nature of the abortion decision, especially when made by a minor, require a State to act with particular sensitivity when it legislates to foster parental involvement in this matter." *Bellotti II*, 443 U. S., at 642 (POWELL, J.). Because Utah's absolute notice requirement demonstrates no such sensitivity, I cannot approve its interference with the minor's private consultation with the physician during the first trimester of her pregnancy.

## C

Finally, appellees assert a state interest in protecting parental authority and family integrity.[43] This Court, of course, has recognized that the "primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition." *Wisconsin* v. *Yoder*, 406 U. S. 205, 232 (1972). See *Prince* v. *Massachusetts*, 321 U. S. 158 (1944); *Meyer* v. *Nebraska*, 262 U. S. 390 (1923). Indeed, "those who nurture [the child] and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Pierce* v. *Society of Sisters*, 268 U. S., at 535. Similarly, our decisions "have respected the private realm of family life which the state cannot enter." *Prince* v. *Massachusetts, supra,* at 166. See also *Moore* v. *East Cleveland,* 431 U. S., at 505.

---

H. L., for example, consulted with a counselor who supported her decision. The role of counselors can be significant in facilitating the pregnant woman's adjustment to decisions related to her pregnancy. See Smith, A Follow-Up Study of Women Who Request Abortion, 43 Am. J. Orthopsychiatry 574, 583–585 (1973).

[43] This interest, although not discussed by the state courts below, was the subject of appellees' most vigorous argument before this Court. The challenged provision does fall within the "Offenses Against the Family" chapter of the Utah Criminal Code, *ante,* at 400 (opinion of BURGER, C. J.), which also provides criminal sanctions for bigamy, Utah Code Ann. § 76-7–101, incest, § 76-7–102, adultery, § 76-7–103, fornication, § 76-7–104, and nonsupport and sale of children, §§ 76-7–201 to 76-7–203 (1978).

448

The critical thrust of these decisions has been to protect the privacy of individual families from unwarranted state intrusion.[44] Ironically, appellees invoke these decisions in seeking to justify state interference in the normal functioning of the family. Through its notice requirement, the State in fact enters the private realm of the family rather than leaving unaltered the pattern of interactions chosen by the family. Whatever its motive, state intervention is hardly likely to resurrect parental authority that the parents themselves are unable to preserve.[45] In rejecting a statute permitting parental veto of the minor woman's abortion decision in *Planned Parenthood of Central Mo.* v. *Danforth*, 428 U. S., at 75, we found it difficult to conclude that

"providing a parent with absolute power to overrule a determination, made by the physician and his minor patient, to terminate the patient's pregnancy will serve to strengthen the family unit. Neither is it likely that such veto power will enhance parental authority or control where the minor and the nonconsenting parent are so fundamentally in conflict and the very existence of the pregnancy already has fractured the family structure."

More recently, in *Bellotti II, supra,* at 638, JUSTICE POWELL observed that efforts to guide the social and moral development of young people are "in large part . . . beyond the competence of impersonal political institutions."

[44] *Wynn* v. *Carey,* 582 F. 2d, at 1385–1386; Note, The Minor's Right of Privacy: Limitations on State Action after *Danforth* and *Carey,* 77 Colum. L. Rev. 1216, 1224 (1977).

[45] "The fact that the minor became pregnant and sought an abortion contrary to the parents' wishes indicates that whatever control the parent once had over the minor has diminished, if not evaporated entirely. And we believe that enforcing a single, albeit important, parental decision—at a time when the minor is near to majority status—by an instrument as blunt as a state statute is extremely unlikely to restore parental control." *Poe* v. *Gerstein,* 517 F. 2d 787, 793–794 (CA5 1975), summarily aff'd, 428 U. S. 901 (1976).

Appellees maintain, however, that Utah's statute "merely safeguards a reserved right which parents have to know of the important activities of their children by attempting to prevent a denial of the parental rights through deception." Brief for Appellees 3. Casting its purpose this way does not salvage the statute. For when the threat to parental authority originates not from the State but from the minor child, invocation of "reserved" rights of parents cannot sustain blanket state intrusion into family life such as that mandated by the Utah statute. Such a result not only runs counter to the private domain of the family which the State may not breach; it also conflicts with the limits traditionally placed on parental authority. Parental authority is never absolute, and has been denied legal protection when its exercise threatens the health or safety of the minor children. *E. g., Prince* v. *Massachusetts, supra,* at 169–170. Indeed, legal protection for parental rights is frequently tempered if not replaced by concern for the child's interest.[46] Whatever its importance elsewhere, parental authority deserves *de minimis* legal reinforcement where the minor's exercise of a fundamental right is burdened.

To decide this case, there is no need to determine whether parental rights never deserve legal protection when their as-

---

[46] Thus, in *Prince* v. *Massachusetts,* this Court held that even parental rights protected by the First Amendment could be limited by the State's interest in prohibiting child labor. See *Wisconsin* v. *Yoder,* 406 U. S. 205, 233–234 (1972) (discussing *Prince*). The State traditionally exercises a *parens patriae* function in protecting those who cannot take care of themselves. See *Ginsberg* v. *New York,* 390 U. S. 629, 641 (1968). Some of the earliest applications of *parens patriae* protected children against their "objectionable" parents. *E. g., Wellesley* v. *Wellesley,* 2 Bli. N. S. 124, 133–134, 4 Eng. Rep. 1078, 1082 (H. L. 1828). See generally Kleinfeld, The Balance of Power Among Infants, Their Parents and the State, Part III, 5 Family L. Q. 64, 66–71 (1971). Every State has enacted legislation to defend children from parental abuse. Wilcox, Child Abuse Laws: Past, Present, and Future, 21 J. Forensic Sciences 71, 72 (1976).

sertion conflicts with the minor's rights and interests.[47] I conclude that this statute cannot be defended as a mere reinforcement of existing parental rights, for the statute reaches beyond the legal limits of those rights. The statute applies, without exception, to emancipated minors,[48] mature mi-

---

[47] The contexts in which this issue may arise are too varied to support any general rule. Appellees cite our recent decision in *Parham* v. *J. R.*, 442 U. S. 584 (1979), to support their claim that parents should be presumed competent to be involved in their minor daughter's abortion decision. That decision is inapposite to this case in several respects. First, the minor child in *Parham* who was committed to a mental hospital was presumed incompetent to make the commitment decision himself. *Id.*, at 623 (STEWART, J., concurring in judgment). In contrast, appellant by statute is presumed competent to make the decision about whether to complete or abort her pregnancy. Furthermore, in *Parham*, the Court placed critical reliance on the ultimately determinative, independent review of the commitment decision by medical experts. Here, the physician's independent medical judgment—that an abortion was in appellant's best medical interest—not only was not ultimate, it was defeated by the notice requirement. Finally, as JUSTICE STEWART emphasized in his opinion concurring in the judgment in *Parham*, the pregnant minor has a "personal substantive . . . right" to decide on an abortion. *Id.*, at 623–624, n. 6.

[48] Most States through their legislature or courts have adopted the common-law principle that a minor may become freed of the disabilities of that status—and at the same time release his parents from their parental obligations—prior to the actual date of his majority. Certain acts, in and of themselves, may occasion emancipation. See, *e. g.*, Cal. Civ. Code Ann. § 62 (West 1954 and Supp. 1981) (emancipation upon marriage or entry in Armed Services); Utah Code Ann. § 15–2–1 (Supp. 1979) (emancipation upon marriage); *Crook* v. *Crook*, 80 Ariz. 275, 296 P. 2d 951 (1956) (same). A minor may become partially emancipated if he is partially self-supporting, but still entitled to some parental assistance. See Katz, Schroeder, & Sidman, Emancipating Our Children—Coming of Legal Age in America, 7 Fam. L. Q. 211, 215 (1973). Several States by statute permit emancipation for a specific purpose, such as obtaining medical care without parental consent, *e. g.*, Cal. Civ. Code Ann. § 34.6 (West Supp. 1981); Mont. Code Ann. § 41–1–402 (1979) (woman of any age may consent to pregnancy-related medical care); Utah Code Ann. § 78–14–5 (4)(f) (1977) (same), § 26–6–39.1 (1976) (minor can consent to medical treatment for venereal disease); Tex. Rev. Civ. Stat. Ann., Art. 4447i (Vernon 1976) (person at least 13 years old may consent to medical

nors,[49] and minors with emergency health care needs,[50] all of whom, as Utah recognizes, by law have long been entitled to medical care unencumbered by parental involvement. Most

treatment for drug dependency). See Pilpel, Minors' Rights to Medical Care, 36 Albany L. Rev. 462 (1972). Several States provide for emancipation once the individual becomes a parent. *E. g.,* Ky. Rev. Stat. § 214.-185 (2) (1977). In Utah, minors who become parents are authorized to make all medical care decisions for their offspring. Utah Code Ann. § 78-14-5 (4) (a) (1977). See generally *Cohen* v. *Delaware, L. & W. R. Co.,* 150 Misc. 450, 453-457, 269 N. Y. S. 667, 671-676 (1934); *L. R.* v. *Hansen,* No. C-80-0078J (Utah, Feb. 8, 1980) (self-supporting minor seeking abortion is emancipated and mature); Goldstein, Medical Care for the Child at Risk: On State Supervention of Parental Autonomy, 86 Yale L. J. 645, 663 (1977) (recommending objective criteria to avoid case-by-case determination of emanicipation).

[49] The "mature minor" doctrine permits a child to consent to medical treatment if he is capable of appreciating its nature and consequences. *E. g., L. R.* v. *Hansen, supra* (this mature minor "is capable of understanding her condition and making an informed decision which she has done after carefully considering the alternatives available to her and consulting the persons with whom she felt she should consult" prior to abortion decision); Ark. Stat. Ann. § 82-363 (g) (1976). See *Lacey* v. *Laird,* 166 Ohio St. 12, 139 N. E. 2d 25 (1956) (physician not liable for battery after acting with minor's consent); *Smith* v. *Seibly,* 72 Wash. 2d 16, 21-22, 431 P. 2d 719, 723 (1967); *Younts* v. *St. Francis Hosp. & School of Nursing, Inc.,* 205 Kan. 292, 300-301, 469 P. 2d 330, 337 (1970).

Four Members of this Court embraced the "mature minor" concept in striking down a statute requiring parental notice and consent to a minor's abortion, regardless of her own maturity. *Bellotti II,* 443 U. S., at 643-644, and nn. 22 and 23. In *Bellotti II,* JUSTICE POWELL's opinion for four Members of this Court suggested that a statute could withstand constitutional attack if it permitted case-by-case administrative or judicial determination of a pregnant minor's capacity to make an abortion decision with her physician and independent of her parents. *Ibid.* Because this view was expressed in a case not involving such a statute, and because it would expose the minor to the arduous and public rigors of administrative or judicial process, four other Members of this Court rejected it as advisory and at odds with the privacy interest at stake. *Id.,* at 654-656, and n. 4 (STEVENS, J., joined by BRENNAN, MARSHALL, and BLACKMUN, JJ.). Nonetheless, even under JUSTICE POWELL's reasoning in *Bellotti II,* the

relevant to appellant's own claim, the statutory restriction applies even where the minor's best interests—as evaluated by her physician—call for an abortion. The Utah trial court found as a fact that appellant's physician "believed along with her that she should be aborted and that he felt it was in her best medical interest to do so but he could not and would not perform an abortion upon her without informing her parents prior to aborting her because it was required of him by that statute and he was unwilling to perform an abortion upon

instant statute is unconstitutional. Not only does it preclude case-by-case consideration of the maturity of the minor, it also prevents individualized review to determine whether parental notice would be harmful to the minor.

[50] *E. g.*, Ky. Rev. Stat. § 214.185 (3) (1977); Utah Code Ann. § 26–31–8 (1976); 1979 Utah Laws, ch. 98, § 7. The need for emergency medical care may even overcome the religious objections of the parents. *E. g.*, *In re Clark*, 21 Ohio Op. 2d 86, 89–90, 185 N. E. 2d 128, 131–132 (Com. Pl., Lucas County 1962); *In re Sampson*, 65 Misc. 2d 658, 317 N. Y. S. 2d 641 (Family Ct.), aff'd, 37 App. Div. 2d 668, 323 N. Y. S. 2d 253 (1970); Mass. Gen. Laws. Ann., ch. 112, § 12F (West Supp. 1981); Miss. Code Ann. § 41–41–7 (1972). Delay in treating nonemergency health needs may, of course, produce an emergency, and for that reason, this Court found statutory provision for emergency but not nonemergency care illogical. *Memorial Hospital* v. *Maricopa County*, 415 U. S. 250, 261, 265 (1974). In asserting that the Utah statute would not apply to minors with emergency health care needs, the Court fails to point to anything in the statute, the record, or Utah case law to the contrary. The Supreme Court of Utah addressed only one kind of emergency: where the parents cannot be physically located in sufficient time to permit performance of the abortion. 604 P. 2d, at 913. The court rejected any other emergency situation as an exception to the statute when it declined to afford a broad interpretation of the phrase, "if possible," which modifies the notice requirement. Even where the emergency is simply that the parents cannot be reached, the statute applies; the physician subject to its sanction merely has been granted an affirmative defense that he exercised "reasonable diligence" in attempting to locate and notify the parents. *Ibid.* The majority purports to draw support for its view of the Utah statute on this point from a Massachusetts statute, construed by the Massachusetts Supreme Judicial Court, see *ante,* at 407, n. 14.

her without complying with the provisions of the statute even though he believed it was best to do so." Civ. No. C–78–2719 (Dec. 26, 1978) (Findings of Fact ¶ 7). Even if further review by adults other than her physician, counselor, and attorney were necessary to assess the minor's best interests, see *Bellotti II,* 443 U. S., at 640–641, 643–644 (opinion of POWELL, J.), Utah's rejection of any exception to the notice requirement for a pregnant minor is plainly overbroad. In *Bellotti II,* we were unwilling to cut a pregnant minor off from any avenue to obtain help beyond her parents, and yet the Utah statute does just that.

In this area, I believe this Court must join the state courts and legislatures which have acknowledged the undoubted social reality: some minors, in some circumstances, have the capacity and need to determine their health care needs without involving their parents. As we recognized in *Planned Parenthood of Central Mo.* v. *Danforth,* 428 U. S., at 75, "[a]ny independent interest the parent may have in the termination of the minor daughter's pregnancy is no more weighty than the right of privacy of the competent minor mature enough to have become pregnant."[51] Utah itself has allocated pregnancy-related health care decisions entirely to the pregnant minor.[52] Where the physician has cause to doubt the minor's actual ability to understand and consent, by law he must pursue the requisites of the State's informed consent procedures.[53] The State cannot have a legitimate interest in adding to this scheme mandatory parental notice of the minor's abortion decision. This conclusion does not

---

[51] As one medical authority observed: "One can well argue that an adolescent old enough to make the decision to be sexually active . . . , and who is then responsible enough to seek professional assistance for his or her problem, is ipso facto mature enough to consent to his own health care." Hofmann, *supra* n. 25, at 51. See Goldstein, 86 Yale L. J., at 633.

[52] Utah Code Ann. § 78–14–5 (4) (f) (1977).

[53] Utah Code Ann. § 76–7–305 (1978) requires voluntary and informed written consent. See n. 36, *supra.*

affect parents' traditional responsibility to guide their children's development, especially in personal and moral concerns. I am persuaded that the Utah notice requirement is not necessary to assure parents this traditional child-rearing role, and that it burdens the minor's fundamental right to choose with her physician whether to terminate her pregnancy.[54]

## IV

In its eagerness to avoid the clear application of our precedents, the Court today relies on a mistaken view of class-action law and prudential standing requirements. The Court's avoidance of the issue presented by the complaint nonetheless leaves our precedents intact. Under those precedents, I have no doubt that the challenged statute infringes upon the constitutional right to privacy attached to a minor woman's decision to complete or terminate her pregnancy. None of the reasons offered by the State justifies this intrusion, for the statute is not tailored to serve them. Rather than serving to enhance the physician's judgment, in cases such as appellant's the statute prevents implementation of the physician's medical recommendation. Rather than promoting the transfer of information held by parents to the minor's physician, the statute neglects to require anything more than a communication from the physician moments before the abortion. Rather than respecting the private realm of family life, the statute invokes the criminal justice machinery of the State in an attempt to influence the interactions within the family. Accordingly, I would reverse the judgment of the Supreme Court of Utah insofar as it upheld the statute against constitutional attack.

---

[54] Cf. *Wynn* v. *Carey*, 582 F. 2d, at 1388.