DECISION AND JOURNAL ENTRY
Summit County Children Services Board ("CSB"), Angela Stanley, andAngela's parents Linda and Frank Schauwecker appeal from the judgment ofthe Summit County Juvenile Court, which granted permanent custody ofAngela's son, Brenden Stanley, to CSB.[1]
 I.
Angela Stanley gave birth to Brenden Tyler Stanley on November 4, 1999. Brenden was born a healthy child. On November 10, 1999, CSB sought and obtained emergency temporary custody of Brenden. CSB removed Brenden from Angela's custody at the hospital. CSB placed Brenden with a foster family. CSB sought emergency temporary custody because the juvenile court had previously granted permanent custody of Angela's two sons, Angel and Carlos, to CSB.[2] CSB was also concerned that Stanley would take her newborn son and return to the home of a friend where she had stayed for over half of her pregnancy. The home belonged to Mrs. Louise Alexander, whose adult son was serving a sentence for a drug-related offense.
Initially, CSB intended to place Brenden with his maternalgrandparents, Linda and Frank Schauwecker (hereinafter "the grandparents,""grandmother," and "grandfather"), after conducting a background check onthem. Both the CSB caseworker and her supervisor found placement withthe grandparents to be a suitable placement. However, on November 19,the trial court issued an order prohibiting CSB from placing Brenden withhis maternal grandparents.
On November 16, 1999, the trial court appointed as guardian ad litem
the same individual who had served as the guardian ad litem for Angela's older children. On the same day, Angela tested positive for marijuana. On December 8, CSB filed an amended complaint adding an alternative disposition of permanent custody, based on the "wishes" of Brenden as expressed by the guardian ad litem. On December 9, the grandparents filed a motion to intervene and a motion for legal custody. On December 16, pursuant to R.C. 2151.412, CSB filed a case plan for reunification of Angela and Brenden, which required Angela to undergo a drug assessment, obtain drug treatment, submit to drug tests twice weekly, successfully complete parenting classes, obtain her GED, and secure permanent stable housing.
On January 5, 2000, the court held a hearing on the grandparents'motion for leave to intervene. The motion was unopposed by all partiesexcept the guardian ad litem. The court denied the motion to intervene,on the basis that the grandparents had never acted in loco parentis forBrenden. On January 13, 2000, an adjudicatory hearing was held, and thecourt adjudicated Brenden dependent.[3] On January 18, 2000, Angela filed a motion for a change in disposition to grant legal custody to the grandparents. On February 3, 2000, CSB moved for leave to withdraw the permanent custody motion, believing that a permanent placement via legal custody to the grandparents was a viable alternative to the permanent custody option. The court denied CSB's motion. The grandparents and CSB filed several additional motions in an effort to effectuate placement with the grandparents, but the trial court denied all motions, except for CSB's alternative motion for a disposition of legal custody to the grandparents.
On February 17, 18 and 24, 2000, the trial court held a permanent custody hearing. The grandparents were permitted to appear as witnesses but were not joined as parties and thus could not call or cross-examine witnesses or present other evidence. Angela and CSB opposed the motion for permanent custody and proposed that legal custody be granted to the grandparents. The guardian ad litem proposed that permanent custody be granted to CSB. Because the guardian ad litem was not an attorney, the court appointed an attorney to represent her in her capacity as guardianad litem.
CSB offered the testimony of four witnesses: CSB social worker StaceyBeck who was Angela's case manager, CSB social service aide CynthiaMcKnight who attended all the family visits with Brenden, and thegrandparents. Angela offered the testimony of Mary Ann Kuhls, a nurse atthe prenatal clinic run by the Summit County Health Department ("SCHD"),and Jerri Kresja, Angela's counselor at the Community Drug Board ("CDB").The guardian ad litem presented four witnesses: an expert on earlychildhood development, Jennifer Weigant who was Stacey Beck's supervisorat CSB, Ms. Kuhls from SCHD, and Robin Korosa, a worker at the CDB.Following the testimony of these witnesses, the guardian ad litem gave anoral report to the court, subject to some limited questioning by theother parties. The guardian ad litem also filed a written report withthe court. All parties submitted various exhibits regarding Angela'scompliance with the case plan and Angela's and the grandparents'involvement with Brenden. The guardian ad litem also filed a copy of theJune 1, 1999 judgment entry terminating Angela's parental rights for herthree older children. The court permitted all parties to submit writtenclosing arguments.
On May 18, 2000, the court entered judgment, terminating Angela's parental rights to Brenden, and granting permanent custody to CSB, over the agency's objections. Angela, CSB, and the grandparents filed appeals. This court consolidated the three appeals.
 II.
The grandparents argue that the trial court abused its discretion in failing to allow them to intervene in the case below. They also argue that the trial court's failure to grant them legal custody was against the manifest weight of the evidence.
Juv.R. 2(X) defines a "party" as "a child who is the subject of ajuvenile court proceeding, the child's spouse, if any, the child's parentor parents, or if the parent of a child is a child, the parent of thatparent, in appropriate cases, the child's custodian, guardian, orguardian ad litem, the state, and any other person specificallydesignated by the court." It is clear that the grant or denial of leaveto intervene is within the discretion of the trial court, absent ashowing that the petitioner should be joined as a necessary party to theexisting case. See Civ.R. 24. The Supreme Court of Ohio has determinedthat, notwithstanding the interest of relatives in the disposition ofcustody of a minor child, the trial court acts within its sounddiscretion in refusing to join such relatives as parties, where there isno showing that the relatives stood in loco parentis to the child. In reSchmidt (1986), 25 Ohio St.3d 331, 336-337.
Unless a person is a party in the lower court case, the individual has no standing to appeal.[4] See Whiteside, Ohio Appellate Practice (1996 Edition) 30, Section 1.27. Because the grandparents were never made parties below, they have no standing to appeal. "Appeal lies only on behalf of a party aggrieved by the final order appealed from; appeals are not allowed for the purpose of settling abstract questions, but only to correct errors injuriously affecting the appellant." (Internal citations omitted.) In re Hiatt (1993), 86 Ohio App.3d 716, 721.[5]
 Consequently, because the grandparents were not allowed to intervene asparties by the trial court, they have no standing to pursue this appeal.The appeal by Linda and Frank Schauwecker is hereby dismissed.
 III.
CSB'S First Assignment of Error:
 THE TRIAL COURT ERRED IN ORDERING PERMANENT CUSTODY TO CHILDREN'S SERVICES BOARD IN THE ABSENCE OF ANY STATUTORY REQUIREMENTS MANDATING THE PLACEMENT.
CSB'S Second Assignment of Error:
 THE TRIAL COURT ERRED IN ORDERING PERMANENT CUSTODY TO CHILDREN'S SERVICES BOARD WHEN PERMANENT PLACEMENT WITH THE AGENCY WAS NOT IN THE CHILD'S BEST INTERESTS.
Angela Stanley's Assignment of Error:
 THE DECISION TO GRANT PERMANENT CUSTODY IS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE THAT PERMANENT CUSTODY IS IN THE BEST INTEREST OF BRENDEN TYLER STANLEY AS REQUIRED BY R.C. 2151.414(B)(1) AND (D).
 CSB's first assignment of error asserts that the trial court erred in awarding permanent custody to CSB where there was a viable possibility of placement with the grandparents. CSB filed a motion for permanent custody within a month after the grant of emergency temporary custody. CSB points out that because of the prior permanent custody determination for Angela's older sons, the agency acted swiftly to file for permanent custody, pursuant to the legislative mandates of H.B 484 and H.B. 176, which were designed to avoid prolonged repeated permanent custody proceedings for subsequent siblings. However, CSB argues that pursuant to the mandates of R.C. 2151.412(F), 2151.413(D) and 2151.415(A), the alternative of relative placement should have been considered by the court before granting permanent custody to CSB. The remaining two assignments of error challenge the trial court's grant of permanent custody to CSB, because the appellants claim there was no clear and convincing evidence to support the best interest determination. This court agrees.
We begin by noting that "[a] termination of parental rights is the family law equivalent of the death penalty in a criminal case. The parties to such an action must be afforded every procedural and substantive protection the law allows." In re Smith (1991),77 Ohio App.3d 1, 16. In Ohio, the cornerstone issue when considering a termination of parental rights and responsibilities is the best interest of the child. R.C. 2151.415(B). The presumptive best interest of any child is to be with the child's own parents. See R.C. 2151.01(C) and 2151.412(F). See, also, In re Murray (1990), 52 Ohio St.3d 155, 157, citing H.L. v. Matheson (1981), 450 U.S. 398, 410, 67 L.Ed.2d 388, 419.
Under the circumstances here, the court may permanently terminate parental rights only if there is clear and convincing evidence both (1) that a grant of permanent custody to CSB is in the best interest of the child and (2) that the child cannot be placed with the parent within a reasonable time or should not be placed with the parent. R.C.2151.414(B)(1).
As this court pointed out in our review of the grant of permanentcustody to CSB of Angela's older sons, clear and convincing evidence isthat which produces in the mind of the trier of fact a firm belief orconviction as to the facts sought to be established. In re Estrada andCastillo (May 24, 2000), Summit App. No. 19683 and 19817, unreported, at5. (Hereinafter "Stanley I.") When an appellate court reviews theweight of the evidence in a permanent custody determination, the courtreviews the entire record, weighs the evidence and all reasonableinferences, considers the credibility of the witnesses and determineswhether the trial court clearly lost its way and created such a manifestmiscarriage of justice that the judgment must be reversed. In re James(Oct. 14, 1998), Summit App. No. 18936, unreported, at 6.
 A. The Evidence The following evidence was presented to the lower court. The guardianad litem offered into evidence the trial court's June 1, 1999 judgmententry terminating Angela's parental rights for her older sons, a decisionthat was later reversed on appeal because it was not supported by clearand convincing evidence. See Stanley I. Stacey Beck, Angela's CSB casemanager testified that she acted as case manager for Angela at the timeof the 1999 permanent custody determination. Jerri Kresja, the managerof the three-quarter house run by RAMAR where Angela was living at thetime also testified that Angela tested positive for an illicit drug earlyin June 1999 and she was evicted from that facility for that. At thetime Angela was pregnant with Brenden.[6] This was the only knownpositive drug test that occurred from the time of the prior permanentcustody in May 1999 to the time of Brenden's birth.
After Angela left the RAMAR house, she moved in with Mrs. Louise Alexander, the mother of Angela's former boyfriend. The boyfriend was in Oriana House correctional facility at the time in question, apparently on drug-related charges.[7] Mary Ann Kuhls, the nurse at a SCHD prenatal care clinic that Angela attended throughout her pregnancy, testified that the prenatal clinic records indicate that Angela advised the clinic staff that she had moved from the RAMAR house and she gave them Mrs. Alexander's address as her current residence.
Ms. Kuhls testified that Angela began prenatal care with a prenatalclinic during the eleventh week of her pregnancy. Ms. Kuhls testifiedthat Angela attended all but two scheduled visits, and those sherescheduled. The nurse also testified that Angela was referred to theprenatal clinic by the Community Drug Board. As a consequence of thisreferral, clinic personnel asked Angela if she would sign a release ofher CDB records. Ms. Kuhls testified that Angela said she was willing tosign a release, but because there were no indications that Angela wasusing drugs, the clinic never asked for a release of her CDB records.Angela submitted to regular blood and urine tests during her pregnancy.She also was conscientious about taking her prenatal vitamins. Ms. Kuhlstestified that she never saw anyone accompany Angela on her clinicvisits, but that because she was always in the exam room, she would notnecessarily know if anyone accompanied a patient to the clinic.[8]
The nurse testified that early on it was discovered that Angela had "precancerous cells." This condition required extra monitoring by yet another prenatal clinic and Angela complied with this extra monitoring. By the time Brenden was born, the precancerous cells had developed into a tumor and Angela was diagnosed with cervical cancer. Brenden was born healthy and drug-free. The birth was through a caesarian section. A hysterectomy was performed to remove the tumor. The grandmother testified that Angela later underwent radiation treatment for the cancer, which involved treatment sessions five times a week for six weeks. The grandmother testified that these treatments left Angela feeling very ill.
The grandparents testified that when Angela arrived at the hospitalfor Brenden's birth, she called the grandparents. They rushed to the hospital, and were present for the birth. The grandparents had prepared a nursery in their home, expecting that Angela and Brenden would return to their home. Angela remained in the hospital from November 4 to 11, 1999, due to the caesarian section and the hysterectomy. CSB social worker Stacey Beck went to the hospital on November 10 to take Brenden from Angela's custody pursuant to an order of Emergency Temporary Custody. Ms. Beck testified that neither Brenden nor Angela tested positive for drugs at the time of the birth. Ms. Beck testified that she did not advise Angela in advance that she was going to remove Brenden and that Angela was upset that Brenden was removed from her care.
Ms. Beck testified that Brenden was immediately placed in foster care,with the intention of placing him with the grandparents once a backgroundcheck was completed. She also testified that a background check wascompleted on the grandparents, and the check came back "negative," in thesense that it revealed no problems. She testified that there were twoalleged CSB contacts involving the grandmother and either Angela or herbrother Steven, dating from 1985 or 1986. However, upon investigation,neither of those alleged incidents was substantiated. Ms. Beck alsotestified that the agency did a background check on Angela and thegrandmother in Arizona, where they resided in the mid-1980's, and thebackground check found no problems. However, on November 17, 1999, thetrial court ordered CSB not to place Brenden with the grandparents untilfurther court order. Ms. Beck testified that, but for the court order,CSB would have placed Brenden with the grandparents. The grandmothertestified that Angela moved in with the grandparents after she left thehospital and she has resided there since.
Cynthia McKnight, a CSB aide, testified that Angela and the grandparents visited Brenden twice a week for regularly scheduled visits at CSB. Ms. McKnight testified that she attended twenty-one of these visits, and that Angela missed only one visit due to illness and the grandmother missed one visit due to a work conflict. Ms. McKnight testified that she observed that Angela and the grandparents interacted appropriately with Brenden. Ms. McKnight testified that the guardian adlitem attended four to five of the visits, for the full session on three of those visits. On three occasions, Ms. McKnight allowed Angela to breast-feed Brenden. Ms. McKnight testified that, despite her six years as a CSB aide in the protective services department, she did not know that Angela should not breast-feed the baby. A CSB supervisor learned about the breast-feeding and she advised Ms. McKnight that Angela was not allowed to breast-feed. Once Ms. McKnight advised Angela that she could no longer breast-feed, she complied with this order. Because Angela had a positive drug test the day prior to the first breast-feeding, Brenden was tested for drugs, and the test came back negative.
Jerri Krejsa, Angela's counselor at the CDB, testified that after theone positive drug test on November 16, 1999, Angela submitted to drugscreens twice a week and they were all negative. Ms. Krejsa alsotestified that she had been involved as Angela's drug counselor since thespring of 1998. She acted as Angela's residential (inpatient) counselor,where Angela successfully completed the sixty-day program, and wastransferred to a partial residential treatment program. When Ms. Krejsabecame involved with Angela again in November 1999, Angela resumed drugtreatment even before the current case plan was filed ordering her toundertake drug treatment. Ms. Kresja testified that Angela has beenconsistently involved with her treatment program since November 1999 andthat Angela has been working toward her stated goals. Ms. Kresjatestified that she always has concerns about a patient's potential forrelapse, but that she was no more concerned for Angela than for any otherpatient.
Ms. Kresja testified that Angela discussed with her the conflict between her drug treatment participation and her involvement with CSB. Angela confided that if she acknowledges in drug treatment that she has a problem, which is a first step toward recovery, CSB will use that information against her by taking her children. However, if Angela denies that she has a drug problem, then she is deemed by her counselor to have no insight into her drug problem, and that fact can be used against her in the issue of permanent custody. Ms. Kresja testified that despite this conundrum, Angela decided at her session on December 10, 1999, that she was going to continue with her drug treatment, regardless of whether she regained custody of her children. Ms. Kresja testified that this was a significant development, indicating Angela's insight and her commitment to pursuing recovery for her own sake. Ms. Kresja testified that she could educate the grandparents about the signs of drug use, so they would become aware if Angela began to use again.
The grandparents testified that when Angela's older children were takeninto the temporary custody of CSB, they believed that they should take a"hands off" approach, to allow Angela to accept responsibility forherself and her children. During the time that the older children werein the temporary custody of CSB, the grandparents were asked on twooccasions to temporarily care for the three children, one of whom hadextensive medical needs. On both occasions, grandmother was recoveringfrom surgery and could not take the children. On one of the twooccasions, the foster mother contacted the grandparents to ask them totake the children for a week. Grandmother testified that neither CSB northe guardian ad litem had contacted the grandparents to request thistemporary care. Grandmother testified that the grandparents visited withthese older children during 1998 and for supervised visitation fromFebruary to May 1999.
Grandmother testified that she did not see Angela more than four or five times from May 1999 until Brenden's birth in November, but that she spoke to Angela on the phone two to three times a week. She also testified that Angela was in contact with her brother Steven. Grandmother testified that Angela had not been actively looking for work, one of her case plan objectives, because Angela had just finished her cancer treatment a few weeks earlier. Grandmother testified that Angela had radiation treatment five times a week for approximately six weeks, and that the treatments left her very ill.
The grandfather testified that, if given legal custody, he would be theprimary caregiver for Brenden, because he is retired and grandmotherworks full-time. He testified that he had been a primary caregiver forhis own children at certain times in their early childhood. He alsotestified that he had cared for Angela's older children from time totime. Grandfather testified that he believed Angela could assist in thechild-care but that she would never be left alone with Brenden. Hetestified that it was intended that Angela would continue to live withthe grandparents, but that if she ever used drugs she would be requiredto leave the house immediately. Grandfather testified that he did notknow the signs of drug use, but that he could tell if Angela was usingdrugs, because her personality changed.
The guardian ad litem called as a witness a Robin Korosa, a case manager for Angela at the CDB in 1999 during her residency at the RAMAR house. Ms. Korosa testified that CDB records stated that in April 1999, while the prior permanent custody motion was pending, "[Angela] took it upon herself to * * * come in and ask for support [regarding the] health of her unborn child. She had a need to address her drug use with CDB staff." Ms. Korosa testified that when Angela tested positive for drugs in early June 1999, Ms. Korosa was aware that there was a permanent custody petition pending, but that she did not know that CSB had been awarded permanent custody of Angela's older sons just prior to Angela's drug use.
The guardian ad litem also called as a witness Dr. Terri Swim, aclinical psychologist who specialized in early childhood education. Dr.Swim testified that she had not interviewed the family, but that she hadobserved them during one visitation with Brenden at CSB. Dr. Swimtestified that infants cannot develop an "attachment" to particularpersons before nine months of age. Caregivers, however, can develop a"bond" with a young child. Dr. Swim testified that Angela and thegrandparents were clearly bonded with Brenden. Dr. Swim testified thatearly in infancy, a child needs consistency of care, meaning that hisneeds are consistently met, not necessarily by a particular person. Aninfant's ability to develop an attachment to a particular person comes atapproximately nine months of age, and Brenden was only three months oldat the time Dr. Swim observed him. So, when asked whether Brenden"trusted" Angela or the grandparents, Dr. Swim testified that she couldnot say that Brenden trusted them, because he was too young to be able totrust a particular person.
Dr. Swim was asked whether, if grandmother had previously raised two children who "had trouble at various times * * * is it possible that that same person, that grandmother, could, without any counseling, retraining or anything, suddenly become a [proper] parent?" Angela's attorney objected to the question as involving speculation, and assuming facts not in evidence. The objection was overruled. However, there was no evidence that the grandmother lacked proper parenting skills when she raised her own children, nor was there evidence that grandmother had not undertaken "any counseling, retraining or anything" since the time of Angela's childhood. Over objection, Dr. Swim answered that "there are three ways in which [parenting] patterns can significantly be changed, but I can only think of two off the top of my head." During the course of her testimony, Dr. Swim was not able to recall the third way. Dr. Swim stated that the first way to change poor parenting skills is "to have another important relationship in your life * * * which is very trusting and [the person is] starting to change their internal working model." The grandmother had testified that when Angela was young, the grandmother was a single parent, but that in 1992, grandmother had married grandfather, who was caring and supportive. Per Dr. Swim, the second way to change poor parenting skills is to undergo intensive counseling. There was no testimony whether grandmother had undergone such counseling. Dr. Swim acknowledged on cross-examination that she did not know enough about the grandparents "to make any determination as to [grandmother's] parenting ability."
 B. Best Interest of the Child
In the instant case, the law governing a permanent custody determination is found in R.C. 2151.414(B)(1), which provides:
 Except as provided in division (B)(2) of this section [where a child has been in the custody of CSB for twelve of twenty-two consecutive months], the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:
 (a) The child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
 (Emphasis added.) The court must determine by clear and convincing evidence both (1) that it is in the best interest of the child for parental rights to be permanently terminated and (2) that the child cannot be placed with the parents within a reasonable time, or that the child should not be placed with the parents.
 As to the best interest determination, R.C. 2151.414(D) provides:
 In determining the best interest of a child at a hearing held pursuant to division (A) of this section * * *, the court shall consider all relevant factors, including, but not limited to, the following:
 (1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child;
 (2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
(3) The custodial history of the child * * *;
 (4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; [and]
 (5) Whether any of the factors in divisions (E)(7) to (12) of this section apply in relation to the parents and child.
 R.C. 2151.414(D)(1)-(5). The factors in divisions (E)(7) to (12), which pertain to the "cannot * * * or should not be placed with the parents" determination, are:
 (7) The parent has been convicted of or pleaded guilty to one of the following:
 (a) An offense under section 2903.01, 2903.02, or 2903.03 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense was a sibling of the child or the victim was another child who lived in the parent's household at the time of the offense;
 (b) An offense under section 2903.11, 2903.12, or 2903.13 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense is the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense;
 (c) An offense under division (B)(2) of section 2919.22 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to the offense described in that section and the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense is the victim of the offense;
 (d) An offense under section 2907.02, 2907.03, 2907.04, 2907.05, or 2907.06 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense is the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense;
 (e) A conspiracy or attempt to commit, or complicity in committing, an offense described in division (E)(7)(a) or (d) of this section.
 (8) The parent has repeatedly withheld medical treatment or food from the child when the parent has the means to provide the treatment or food, and, in the case of withheld medical treatment, the parent withheld it for a purpose other than to treat the physical or mental illness or defect of the child by spiritual means through prayer alone in accordance with the tenets of a recognized religious body.
 (9) The parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan issued pursuant to section 2151.412 of the Revised Code requiring treatment of the parent was journalized as part of a dispositional order issued with respect to the child or an order was issued by any other court requiring treatment of the parent.
(10) The parent has abandoned the child.
 (11) The parent has had parental rights involuntarily terminated pursuant to section 2151.353, 2151.414, or 2151.415 of the Revised Code with respect to a sibling of the child.
 (12) The parent is incarcerated at the time of the filing of the motion for permanent custody or the dispositional hearing of the child and will not be available to care for the child for at least eighteen months after the filing of the motion for permanent custody or the dispositional hearing.
R.C. 2151.414(E)(7)-(12).
 The trial court's judgment entry concluded that "[t]he best interest of the child, as demonstrated by clear and convincing evidence, and as recommended by the child's Guardian ad Litem, is that he be placed in the Permanent Custody of CSB." The court made only one evidentiary finding that would warrant this best interest determination, namely, the fact that Angela had her parental rights terminated as to her two older sons. See R.C. 2151.414(D)(5) and (E)(11). However, that termination of parental rights was reversed by this court in Stanley I, because this court found that there was no clear and convincing evidence to support the determination that permanent custody was in the children's best interest. In the instant case, there was no clear and convincing evidence to support a finding of any of the other factors listed in R.C. 2151.414(D)(5) and (E)(7)-(12).
Reviewing the evidence before the trial court on the remaining best interest factors of R.C. 2151.414(D), the testimony established that Brenden was too young to have established an attachment to his foster family, his mother, or his grandparents. See R.C. 2151.414(D)(1). Angela and the grandparents had visited with Brenden for the maximum time allotted for visits, twice a week for one and one-half hour visits each, from the time Brenden was taken from Angela to the time of the permanent custody hearing. All testimony established that the interaction of Angela and the grandparents with Brenden was appropriate and nurturing. The guardian ad litem's expert witness testified that Angela and the grandparents had bonded with Brenden. CSB offered clear and convincing evidence that a legally secure placement could be achieved with the grandparents who were capable of and willing to care for Brenden in their home. See R.C. 2151.414(D)(4). Because Brenden's custodial history with CSB had lasted only three months at the time of the hearing (although over six months by the time the trial court entered judgment on May 18, 2000), that factor did not weigh heavily in favor of a permanent custody determination. See R.C. 2151.414(D)(3).
As in Stanley I, the sole factor supporting a determination that permanent custody was in the best interest of the child, was "[t]he wishes of the child, as expressed directly by the child or through the child's guardian ad litem." R.C. 2151.414(D)(2). The guardian ad litem
presented the following evidence in support of termination of Angela's parental rights: the prior termination of parental rights, which was reversed by this court; Angela's use of marijuana in early June 1999, when her parental rights to her older sons were permanently terminated over the objection of Angela, the grandparents, and CSB; her positive test for marijuana on November 16, 1999, just days after Brenden was removed from her at the hospital; the fact that during her pregnancy Angela lived with a woman whose son, Angela's former boyfriend, had a history of drug abuse; and that Angela on three occasions visited this former boyfriend while he was incarcerated at Oriana House.
The guardian ad litem addressed the court at the permanent custody hearing and stated that she believed that permanent custody was in Brenden's best interests. When the court asked her why she thought it was in Brenden's best interest to give permanent custody to CSB, the guardian ad litem stated that "he's entitled to a loving home, he's entitled to a good start. I have concerns about his mother and other people that are stepping forward to take care of him. I believe for an infant, adoption, you know, would be a positive disposition." Both opposing parties were allowed to engage in limited questioning of the guardian ad litem, short of cross-examination.
The guardian ad litem expressed concern that Angela uses drugs to cope with stress in her life. However, the evidence only established that Angela used drugs on two occasions, when she found out that the court had granted permanent custody of her older sons to CSB and when CSB took Brenden from her care. The guardian ad litem alleged that Angela quit attending her GED classes, in violation of her case plan. However, the guardian ad litem offered as evidence only a document showing that Angela attended twenty-one classes GED classes from September 20, 1999 to January 3, 2000, for a total thirty-eight hours. There was no evidence that Angela dropped out of the GED class. There was evidence that Angela's attendance ended during the period of her radiation therapy. The guardian ad litem alleged that Angela had not completed applications for low income housing, as was part of her case plan. However, once again the guardian ad litem offered no evidence in support of this allegation.
The guardian ad litem also alleged that Angela knowingly lied about the identity of Brenden's father; however, she offered no evidence to support the allegation. In her statement to the court on this point, theguardian ad litem stated, "I believe Aaron Williamson never existed, and I came to find that there is reason to believe that the father is in fact a gentleman by the name Christopher Smith [rather than Christopher Steiner]." The allegation that Angela lied to conceal the identity of the father was totally unsupported by any evidence. Although the guardian ad litem stated that she believed she had determined the true identity of the father, she did not contact this individual to ascertain if he was the father and, if so, whether it was in Brenden's best interest to live with the father. When asked about this, the guardian adlitem responded "Have I talked to the father? Nobody's ever come forward."
The guardian ad litem stated that she did not believe that either Angela or the grandparents had changed since the time of the prior permanent custody hearing in May 1999, for Angela's older sons. When asked if she had talked to Angela about changes she may have made in her life since that time, the guardian ad litem stated that she had not talked to Angela, but that she had only observed Angela's and the grandparents' visits with Brenden. She was asked about her observation of the interaction of Angela and the grandparents with Brenden at their twice-weekly visitation sessions. Of the twenty visits that both Angela and the grandparents attended, the guardian ad litem said she visited ten, some for less than the full visit. The guardian ad litem likewise stated that she had not talked to the grandparents about any changes in their life since the prior hearing. Rather, she said that "[I]n listening to [Angela's and the grandparents'] conversations I determined that, you know, nothing had changed. [Grandmother] was still working full time, [grandfather] was still a house-husband, they still had their dog. I learned all about [grandmother's] hobbies, her sleep patterns." On further questioning, it was clear that the guardian adlitem had engaged only in small-talk with Angela and the grandparents, and she did no further investigation of the family as to whether they were appropriate persons to care for Brenden. Thus, although the guardian ad litem had concerns about the grandparents' ability to raise Brenden, she did not undertake any investigation to determine whether these concerns were warranted. In fact, the guardian ad litem's sole witness on the issue of the grandparents' fitness to care for Brenden stated that she could not make any comment on their parenting ability.
Angela's attorney asked the guardian ad litem how she assessed "a loving home." She answered, "Well, the foster home wants to adopt him." The guardian ad litem stated that she had visited Brenden's foster home three times since Brenden's placement there but that she had not visited the grandparents' home where Angela had resided since Brenden was born. When asked if she had made any efforts to work with CSB or Angela toward the goal of reunification, the guardian ad litem stated that she was not sure if that was part of her role.
Finally, it is clear that the guardian ad litem opined that permanent custody was in Brenden's best interest because "in my feeling, legal custody can be changed. With legal custody, mother has residual rights."[9] Thus, despite the fact that the legislature has determined that in some cases a "legally secure permanent placement * * * can be achieved without a grant of permanent custody to [CSB]," R.C.2151.414(D)(4), the guardian ad litem here determined that anything less than permanent custody is not a "legally secure permanent placement" and therefore is de facto not in Brenden's best interest.
Because CSB opposed the permanent custody motion, the guardian adlitem was required to support her motion for permanent custody to CSB by presenting clear and convincing evidence that permanent custody was in Brenden's best interest. There was not clear and convincing evidence demonstrating that the only legally secure placement was a grant of permanent custody to CSB. Nor was there clear and convincing evidence that due to a lengthy custodial history or attachment to other caregivers, Brenden's best interest would be served by terminating parental rights. Thus, only the child's wishes, as expressed by the guardian ad litem, would arguably support a best interest determination for permanent custody. The guardian ad litem's expression of the child's "wishes," however, is based on fundamental assumptions that go contrary to the statutory provisions of R.C. 2151, and is essentially unsupported by any evidence.
The determination by the trial court that permanent custody was in the best interest of Brenden was not supported by clear and convincing evidence. Angela's assignment of error and CSB's assignments of error are well-taken.
 IV. The judgment of the trial court terminating the parental rights ofAaron Williamson and Christopher Steiner is affirmed. The judgment of thetrial court is reversed as to the termination of the parental rights ofAngela Stanley for her son Brenden Tyler Stanley and the grant ofpermanent custody of Brenden Tyler Stanley to CSB. The cause is remandedto the trial court for further proceedings consistent with this opinion.
 Judgment affirmed in part, reversed in part, and cause remanded.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the County of Summit, Court of Common Pleas, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E).
Costs taxed to appellee, guardian ad litem.
Exceptions.
[1] Aaron Williamson and Christopher Steiner were named as putative fathers. The two men, and a John Doe, were served with notice of the permanent custody hearing. None of the men appeared at the permanent custody hearing. The trial court terminated the parental rights of Williamson and Steiner. Neither man appealed the termination of his parental rights.
[2] Prior to Brenden's birth, Angela appealed the trial court's termination of her parental rights for Angel and Carlos, and this court reversed the termination. See In re: Carlos Estrada and Angel Castillo
(May 25, 2000), Summit App. No. 19683 and 19817, unreported. Angela Stanley also voluntarily surrendered her parental rights for her daughter, Bianca, who was born with spina bifida and required substantial medical care. Angela did not appeal the termination of her parental rights for Bianca.
[3] Brenden was determined to be a dependent child based on the prior adjudication of neglect of his older siblings. See R.C. 2151.04.
[4] But, see, In re Travis Children (1992), 80 Ohio App.3d 620, 625-626
(holding that a grandparent had standing to appeal despite lack of party status at the trial level, where the trial court allowed grandparent to testify and the court allowed grandparent to file a motion for legal custody).
[5] But, see, In re Evens and Secession (Feb. 2, 2000), Summit App. No. 19489, unreported, at 3-5 (holding that a parent may appeal the juvenile court's denial of a non-appealing relative's motion for legal custody, because the court's decision prejudicially affects the appellant's right to retain residual parental rights); In re Hiatt (1993),86 Ohio App.3d 716, 722; R.C. 2151.011(B)(10) (defining residual parental rights).
[6] Angela's pregnancy was known to the trial court at the time of Angela's earlier permanent custody hearing.
[7] It is unclear how long he was incarcerated at Oriana House; he was still there in January 2000.
[8] The trial court's judgment entry states that the nurse "asserted that no one, including the [grandparents] ever accompanied [Angela] to any prenatal appointments." That does not accurately reflect the testimony according to the transcript of the proceedings. The nurse pointed out that she always remains in the exam room, and that the patient is called back from the waiting room. When asked if anyone accompanied Angela to her visits, the nurse testified, "Oh, I don't know. [Any companions] are out in the waiting room. We call the patient back to the exam room. I don't know."
[9] The rights of a legal custodian are subject to the residual rights of the child's natural or adoptive parents. R.C. 2151.011(B)(17). Residual parental rights are defined as:
 [T]hose rights, privileges, and responsibilities remaining with the natural parent after the transfer of legal custody of the child, including, but not necessarily limited to, the privilege of reasonable visitation, consent to adoption, the privilege to determine the child's religious affiliation, and the responsibility for support.
 R.C. 2151.011(B)(41). The trial court retains jurisdiction over the child after an award of legal custody is made and may amend the dispositional order at any time upon its own motion or upon motion of any interested party. Section 2151.41.7(A); Rule 36(A) of the Ohio Rules of Juvenile Procedure; In re Bowman
(1995) 101 Ohio App.3d 599, 601-602.